LINA BARBER, appellant, v. DILLARD POWELL et ux., appellees.

No. 49120.

(Reported in 82 N.W.2d 665)

786

MAY 7, 1957.

White & White, of Harlan, for appellant.

G. O. Hurley, of Harlan, for appellees.

GARFIELD, J.—This is an equity suit by an 88-year-old widow to set aside a warranty deed to her daughter and son-in-law, reserving a life estate to the grantor, of 80 acres of unimproved farm land in Shelby County. The suit is based on the claim the deed was procured by undue influence of the grantees. Following trial to the court plaintiff was denied relief and title was quieted in defendant-grantees subject to the grantor's life estate. Plaintiff has appealed.

The case presents largely fact questions. Although our review is de novo we give weight to the trial court's findings. Groves v. Groves, 248 Iowa 682, 692, 82 N.W.2d 124, 130, and citations.

As in the Groves case and many others of this kind the vital question is whether, when the deed was made on January 6, 1954, a confidential relationship existed between plaintiff and the grantees in which they were the dominant persons and she the subservient one. Under our decisions, if such relationship were clearly shown, there would arise a presumption the deed was procured by undue influence which the grantees must rebut by clear, satisfactory and convincing evidence. Groves v. Groves, supra, and citations at page 693 of 248 Iowa, page 131 of 82 N.W.2d.

The trial court found it was not clearly shown there was such a confidential relationship between plaintiff and defendants as to place upon the latter the burden of showing the fairness of the transaction. We think we are not warranted in reaching a contrary conclusion on this vital question. Since there is clearly insufficient proof the deed was procured by actual undue influence or that plaintiff was mentally incompetent to execute it, our conclusion on the question of confidential relationship is decisive of the appeal and results in an affirmance.

We will recite such of the facts as give a fair indication of the controversy. Evidence for plaintiff is mostly that given by her and what was elicited from defendant Dillard Powell whom plaintiff called as her witness. Defendants' testimony consists of that given by them, the lawyer who prepared the deed and by two women acquaintances of plaintiff who testified briefly.

Plaintiff is the widow of Joe Barber who died in 1933 owning a quarter section farm in Shelby County. In addition to defendant Cecile Powell, two other daughters and a son also survived. One daughter lives in Des Moines, another in Ohio and the son, Dale, in Omaha. Plaintiff was left a life estate in the farm with the remainder in equal shares to the son and three daughters. Plaintiff continued to reside in the 10-room

modern house on the farm until a few days after the deed in controversy was made in January 1954, when she went to stay with Dale in Omaha.

Defendant Dillard (Dick) Powell started work for Joe Barber as a hired hand in 1920. He married his codefendant Cecile in 1928. They lived in a small tenant house, not modern, on the farm until April 1953, when by mutual agreement they moved into the large, modern home with plaintiff. The last few years of Mr. Barber's life he and Powell were in partnership in all or part of the farming operations. After Mr. Barber died Powell purchased plaintiff's interest in the partnership and operated the farm as a tenant on the familiar share-rent basis. The farm was mortgaged for $4000 when Mr. Barber died but plaintiff paid off this debt some years later, evidently largely with rentals from the farm.

In the fall of 1945 Powell called it to plaintiff's attention that an unimproved 80-acre tract adjoining the home farm was for sale. Plaintiff consulted her son, Dale, about purchasing it and decided to do so at a cost of $5250. It is this 80-acre tract plaintiff conveyed to defendants on January 6, 1954, which is here in dispute. Powell farmed the eighty as tenant along with the 160 acres.

During the more than twenty years after Mr. Barber's death that plaintiff and defendants lived on the home farm (as stated, mostly in separate houses) there was evidently little friction or lack of harmony between them. For a total of two months or more of the year, but not quite every year, plaintiff visited one of her other daughters, her son or her brother. When plaintiff was not away she ate many meals, except breakfast, with defendants. They testify she ate more than half her noon and evening meals with them. Plaintiff says in effect this is too high an estimate. Plaintiff did not drive an automobile. When she wanted to go somewhere Cecile or Dick would take her in their car. Cecile helped her mother with wallpapering, laying linoleum or any heavy work.

Because of these meals, transportation and help furnished plaintiff there was some talk between defendants and her that they were entitled to be paid in some amount. Plaintiff testifies defendants frequently urged her to pay them as much as

$5000 for what they had done for her and she concluded from these requests they wanted the 80 acres. Plaintiff admits, however, that neither defendant ever asked her to convey this land to them. Defendants deny $5000 or any other sum was ever mentioned to plaintiff as owing them and say she told them Mr. Barber planned to do something for them because they stayed on the farm.

October 1, 1951, plaintiff made a will which left $2000 to Cecile "for the kindness and consideration she has shown by dwelling near me." Subject to this legacy the will left her estate in equal shares to her son and three daughters. The son was named executor. Attorney Leonard Fromm of Harlan prepared this will for plaintiff. Sometime before the trial it was superseded by a later will prepared by Attorney Swensen of Omaha to whom Dale took his mother. Plaintiff testifies that defendants, especially Dick, said in effect this $2000 legacy was much too small to pay them for what they had done for her. Defendants deny this testimony.

January 6, 1954, Cecile asked Dick to take plaintiff to Harlan to see Attorney Lyle Higgins. After telephoning Mr. Higgins to inquire whether he could see plaintiff, Dick drove her to Higgins' office. Cecile testifies plaintiff had asked her if Dick would take her to Harlan to attend to some business. Plaintiff denies this and says Cecile told her to go to Harlan with Dick. When plaintiff and Dick arrived at Mr. Higgins' office they were kept waiting some time. Higgins and Dick testify that when plaintiff went into the attorney's private office she asked that Dick come also. Plaintiff denies this and says Dick saw Higgins alone before she did.

Mr. Higgins testifies in detail as to what was done in his office: plaintiff said she was about to leave on visits to her son, and her daughter in Ohio; she wanted him to prepare a deed to the 80 acres to Cecile and Dick; Higgins asked her whether she wanted the grantees named as tenants in common or joint tenants and explained to her the difference in the two terms; plaintiff said she wanted a joint tenancy; after the deed was prepared he read it all to her (plaintiff admits this); plaintiff stated she wanted the use of the land as long as she lived and such a reservation was inserted in the deed; Higgins then

asked plaintiff if the deed was what she wanted, she said it was, signed it and Higgins acknowledged her signature; plaintiff handed the deed to Dick and told him to take care of it. Dick, at Higgins' suggestion, filed the deed for record at the court-house.

Mr. Higgins insists he got all his directions about preparing the deed from plaintiff and Powell said nothing about it. He expresses the opinion plaintiff was of sound mind and knew what she was doing at the time. Other witnesses testify plaintiff was of sound mind at that time. There is no testimony to the contrary although plaintiff says she was so upset by defendants' persistent requests to do something for them she did not know what she was doing that day and did not intend to make the deed.

Plaintiff never was in Higgins' office before. Higgins had made out her income tax returns for about twelve years from figures prepared by Cecile, brought to him by Dick. Higgins also examined the abstract of title to the 80 acres when plaintiff purchased it in 1945. Higgins' direct contacts regarding these matters were with Dick, not plaintiff. After this suit was commenced Higgins first appeared for defendants before with-drawing, evidently to become a witness.

A few days after the deed was made defendants took plaintiff at her request to her son's in Omaha. She told her son (Dale) about having made the deed. He criticized her for doing so and took her to Attorney Swensen in Omaha and later to attorneys in Harlan who commenced this suit April 22, 1954. Plaintiff never returned to live with defendants although when she left she evidently did not intend to leave permanently. She testifies on cross-examination, "As a matter of fact, Dale was the one who started this lawsuit. I did what he told me to do. I talked to my daughter (in Des Moines). She thought like I did, it (the deed) was a terrible thing." On redirect examination, however, plaintiff says, "Why sure, I am the one that wants the deed back."

On the question whether a confidential relation existed between plaintiff and defendants in the sense in which the term is used in cases of this kind, it is clear there was a rather close family relation between them. It appears Powell usually de-

cided what crops to plant on the land he was renting. As a rule he talked with plaintiff about making any repairs. Powell admits he advised plaintiff about her business affairs. He paid her taxes usually when she was away. We have referred to the preparation of plaintiff's income tax returns by Attorney Higgins. Defendants attended to having this done. Powell signed several of these returns.

During about eleven and one-half years just before this deed was made Powell wrote about forty-three checks on plaintiff's bank account. These are about one tenth of all checks written on the account during this period. Except for sixteen checks Dale wrote, plaintiff wrote the others herself. Powell testifies what each check was given for and that plaintiff directed him in each instance to write it. The checks were mostly for taxes, insurance on the farm buildings, fuel for plaintiff's home, fence material, seed and Higgins' charges for preparing tax returns. It also appears Powell signed the check to pay for the 80-acre tract when plaintiff bought it. She was away at that time. There is no claim any of plaintiff's funds were misappropriated.

In regard to the above matters Powell says, "I have not written any checks or transacted any business for Mrs. Barber except on her specific direction, at or before the time I did it." Although plaintiff's testimony is somewhat confusing on this point she testifies at one place, "I told Dick to pay my taxes when they became due and thought he would."

It appears plaintiff consulted her son, Dale, about important business matters such as the purchase of the 80 acres and the question of defendants' moving into the large home. Dale also acted for plaintiff in rent settlements with Powell. Plaintiff says, "When I had any business affairs, I did talk it over with my son." Dale became plaintiff's agent to look after management of the farm—plaintiff's petition so alleges.

In this connection plaintiff's counsel criticize defendants for not informing Dale of plaintiff's plan to make this deed. Defendants insist, however, they had no knowledge of such plan until the deed was executed. In any event it has little bearing on the existence of a confidential relationship between plaintiff

and defendants that the latter gave Dale no advance notice of the making of the deed.

We have not mentioned some evidence upon which plaintiff relies. But it has not been overlooked. Nor have we referred to all the testimony favorable to defendants.

Although there is some evidence defendants were the dominant persons in a confidential relationship with plaintiff at the time the deed was made, the showing is not sufficiently clear to justify a reversal of the trial court's decision on this question. It appears Dale, not defendants, was plaintiff's confidential adviser and readily persuaded her she should not have made the deed and should bring this suit to set it aside.

As plaintiff concedes, a clear showing of such a confidential relationship is required. Groves v. Groves, supra, 248 Iowa 682, 692, 82 N.W.2d 124, 130, and citations. At least one of our recent precedents says the showing must be clear and convincing. Else v. Fremont Methodist Church, 247 Iowa 127, 140, 73 N.W.2d 50, 57.

The trial court found plaintiff was exceedingly well preserved physically and mentally for one of her age. We think the record supports the finding. The court also found, and plaintiff's counsel conceded in argument, she knew she was executing the deed. Although plaintiff challenges the finding the deed is reasonable under the circumstances, in view of the care and affection defendants bestowed on plaintiff over a long period, we are not persuaded it is erroneous. The conveyance can scarcely be called unnatural. It does not leave plaintiff destitute. She still has the income from 240 acres of farm land which evidently has been more than enough to support her up to now.

Much is said in plaintiff's argument about the lack of independent advice given her at the time the deed was made. It is claimed she should have been cautioned as to the consequences of her act. It is true Mr. Higgins was the attorney Powell consulted when he needed legal advice. However, it does not appear Higgins acted unfairly toward plaintiff in the transaction under attack. Although he did not warn her of the consequences of making the deed, Higgins did satisfy himself plaintiff wanted to make it. As stated, Higgins had made out her income tax returns and examined the title to the 80 acres, at Powell's request.

■ We have frequently pointed out the question of independent advice to the grantor is an important consideration where there is a confidential relation between the grantor of a deed and a grantee who is in a position of dominance. Johnson v. Johnson, 196 Iowa 343, 348, 349, 191 N.W. 353; Merritt v. Easterly, 226 Iowa 514, 528, 284 N.W. 397; Woolwine v. Bryant, 244 Iowa 66, 70, 71, 54 N.W.2d 759, 761, 762; Daniels v. Fackler, 244 Iowa 1163, 1168, 58 N.W.2d 309, 312.

■ However, the matter of independent advice is not of such importance where a confidential relation between grantor and grantee is not shown and the burden remains on the grantor throughout to show by clear, satisfactory and convincing evidence the conveyance was procured by undue influence. At least lack of independent advice in such cases is not sufficient basis for a finding of undue influence. See in this connection O'Brien v. Stoneman, 227 Iowa 389, 398, 399, 288 N.W. 447. In fact lack of independent advice is not necessarily fatal to the validity of a deed where a confidential relation exists between the parties thereto. Daniels v. Fackler, supra, 244 Iowa 1163, 1168, 58 N.W.2d 309, 312.

■ Plaintiff suggests the deed was without consideration. The instrument recites consideration of one dollar and other valuable consideration. We think there was valuable consideration for it. In any event an executed and delivered deed is not invalid merely because it is without consideration. Want of consideration is a ground for avoidance of an executory contract but not, as between the parties thereto, of an executed conveyance. Groves v. Groves, supra, 248 Iowa 682, 697, 82 N.W.2d 124, 133, and citations.

We have frequently said the decision in controversies of this kind depends largely upon the facts of the particular case. However, we think these precedents support our holding here: Groves v. Groves, supra; Stephenson v. Stephenson, 247 Iowa 785, 793–797, 74 N.W.2d 679, 684–686; Menary v. Whitney, 244 Iowa 759, 56 N.W.2d 70; Arndt v. Lapel, 214 Iowa 594, 243 N.W. 605; O'Neil v. Morrison, 211 Iowa 416, 423–425, 233 N.W. 708.—Affirmed.

All JUSTICES concur.