M. G. Luse, administrator of estate of Mary Kauzlarich, deceased, appellee, v. Albena Grenko, appellant.

No. 49846.

(Reported in 100 N.W. 2d 170)

December 15, 1959.

Valentine, Greenleaf & Griffing, of Centerville, for appellant.

Milani & Milani, of Centerville, for appellee.

GARFIELD, J.—The administrator of the estate of Mary Kauzlarich, deceased, brought this suit in equity against Albena Grenko, a daughter, claiming the estate is the owner of a bank savings account of $6500 and three U. S. bonds, Series H, in the total amount of $2500 (two for $1000 and one for $500), held by defendant. Plaintiff claims that on June 2, 1956, when defendant was made joint owner with decedent of the bank account, previously in decedent's name, a confidential relation existed between them in which defendant was the dominant person, thus giving rise to a presumption of fraud or undue influence in the transaction. Also that such relation existed July 10, 1956, when the bonds, payable to decedent or defendant, were purchased with decedent's money.

Following trial the court held there was such a confidential relation at the times mentioned and defendant failed to overcome the presumption of overreaching on her part by showing de-

cedent acted of her own free will, with full knowledge of the effect of her actions. Defendant was ordered to transfer the bank account and bonds to plaintiff. Of course the appeal to us is by defendant.

I. Although our review is de novo we give weight to the trial court's findings. Groves v. Groves, 248 Iowa 682, 692, 82 N.W.2d 124, 130, and citations. Indeed, where similar issues were involved we have said, "We deem this a proper case for us to lean heavily on the judgment of the trial court, even though we try it on appeal de novo." Luebke v. Freimuth, 248 Iowa 58, 67, 78 N.W.2d 473, 479. Although the case may be close, when we give the trial court's findings the weight to which they are entitled, we feel we are not justified in reaching a contrary decision.

II. Plaintiff had the burden to show by clear proof the existence of the confidential relation claimed by him, in which defendant was the dominant person and decedent the subservient one. Groves v. Groves, supra, and citations; Barber v. Powell, 248 Iowa 785, 792, 82 N.W.2d 665, 669; Van Emmerik v. Mons, 249 Iowa 1299, 1304, 90 N.W.2d 433, 436.

III. The question of confidential relationship assumes such importance here because actions of this kind in which such relationship exists are governed by a different rule than applies where it is not shown. Ordinarily one who attacks a transfer of money or property because of fraud or undue influence must show existence thereof by clear, satisfactory and convincing proof. However, where it clearly appears the transferee was the dominant person in a confidential relationship with the transferor a presumption arises that the transfer was obtained by fraud or undue influence which the transferee must rebut by clear, satisfactory and convincing evidence. Groves v. Groves, supra, 248 Iowa 682, 692, 693, 82 N.W.2d 124, 130, 131; Barber v. Powell, supra, 248 Iowa 785, 787, 82 N.W.2d 665, 666, 667.

The Groves opinion goes on to point out: "We have been slow to define the precise limits of a confidential relationship. It is clear it may exist although there is no fiduciary relation. As Restatement, Trusts, section 2, comment b, says, it exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind.

It does not arise solely from blood relationship such as between parent and child. The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. Purpose of the doctrine is to defeat and correct betrayals of trust and abuses of confidence.

"Numerous decisions support the above views. The leading ones are Curtis v. Armagast, 158 Iowa 507, 138 N.W. 873, and Merritt v. Easterly, 226 Iowa 514, 284 N.W. 397."

IV. Decedent, Mary Kauzlarich, then 84, died intestate March 5, 1957, survived by three sons and two daughters. A fourth son, Matt, died in 1950 leaving two daughters. Mary's husband died in 1945. The first six years she was a widow Mary made her home with her daughter, Ruth Swab. In 1951 she moved into the dwelling on the home farm of something less than 80 acres in which her husband left her a life estate. Defendant, Albena Grenko, and her husband moved into the same dwelling at that time. The three continued to live there until the mother died. Mary paid defendant $25 a month for her board. The Grenkos paid no rent. Mary's son John, who farmed adjoining land, rented the farm land on the home place from his mother for $300 a year.

Mary was born in Croatia in 1872 and came to this country in 1920. She never went to school. She could not read or write English or her native language, Croatian. Except for a few simple words such as "hello" and "goodbye" she could not speak English. Members of her family always conversed with her in Croatian. Mary's husband conducted the business of the family as long as he could. When he was no longer able to do so the son John helped him.

While the mother lived with her daughter Mrs. Swab she did her mother's business for her with some help from her brother John. During the six years the mother lived with the Grenkos defendant looked after her business for her. Defendant testified, "I handled financial transactions for my mother. * * *. Q. While your mother lived with you did other of her children take her to handle transactions? A. No." On several occasions during the last few years the mother lived defendant signed the former's name to receipts for her money withdrawn from the

bank. Sometimes the two were together and sometimes defendant was alone on these occasions.

When defendant's name was added to her mother's savings account in the bank on June 2, 1956, defendant went there with Mary and told the bank teller her mother desired to withdraw interest on the account ($70.17) and $500 from the principal, and that defendant's name was to be added to the balance of the account ($6500). Before doing so defendant talked with her mother in Croatian, which the teller did not understand, and then told the teller what she said Mary's wishes were. The banker then added the words "or Albena Grenko" following the name "Mary Kauzlarich" on the bank's ledger sheet of the account and on Mary's passbook. The teller also stamped the words, "As joint tenants with remainder to survivor" on the passbook.

The bonds were purchased with money Mary kept in postal savings since it was turned over to her by her husband shortly before his death. On July 10, 1956, defendant accompanied her mother to the post office where $50 interest was withdrawn in cash from the account and a check or draft was obtained for the principal of $2500. The two then went to the bank with this paper and an order was placed for the Series H bonds payable to Mary Kauzlarich or Albena Grenko. Later that month the bonds were received by mail at the family home. Defendant put them in her safe-deposit box at the bank. Defendant's husband testified that in a conversation in which he took no part he heard Mary tell Albena to put the bonds in the latter's "safety box just like her own."

The bank account and the postal savings were substantially everything of value decedent had except the life estate in the farm. No assets came into the administrator's hands except this claim against defendant for the bank account and bonds. Defendant and her husband filed a claim for more than $8000 against plaintiff for care and services furnished decedent during the six years they lived together. The claim states it is filed for the sole purpose of preserving claimant's rights should Albena be unsuccessful in her defense of the present suit.

Decedent was in failing health when the transactions under attack occurred. The daughter Ruth Swab testified her mind was getting weaker while Mary lived with her. Ruth and one of

Matt's daughters said that during the last year of her life she had spells when her mind was not right. Defendant testified her mother was in pretty good health until 1956 when she got a feeling she was weakening a little. The latter part of May 1956 a doctor was called to treat decedent and she was a patient of his until her death. She was suffering from arteriosclerosis with some senility, but not senile dementia. She was not mentally incompetent, at least until about December 1956. (She died March 5, 1957.)

It seems quite clear decedent because of her inability to read, write or speak the English language, her age and failing health was unable to transact business for herself. Naturally she turned to defendant and depended upon her to do it for her. Defendant had gained her mother's confidence and purported to act with the latter's interest in mind. We think the showing of confidential relationship is sufficient.

We have little doubt defendant has failed to rebut by the requisite degree of proof the presumption of fraud or undue influence which surrounds these two transactions. At best it is questionable decedent intended to make defendant the owner of either the bank account or bonds or understood she was doing so. Defendant says in argument she "makes no claim of a present gift of the bank account. Her mother did not part with dominion or control over it. * * * What she actually did was to create a contractual agreement providing for the payment of such sums as might remain at her death to the daughter who had so lovingly cared for her the last six years of her life. Appellant does claim there was a valid gift of the bonds."

One answer to this argument is that the main support for it is defendant's own testimony which she was incompetent to give under section 622.4, Code, 1958, the dead man statute, over objection by plaintiff. In re Guardianship of Munsell, 239 Iowa 307, 315, 31 N.W.2d 360, 364, and citations; Pruitt v. Gause, 193 Iowa 1354, 1359, 188 N.W. 798.

Some of defendant's evidence consists of denials of personal communications between her and her mother. Defendant was incompetent to give such testimony over objection. We have frequently recognized that a witness testifies to a personal transaction no less when he denies it than when he affirms it.

In re Estate of Stratman, 231 Iowa 480, 483, 1 N.W.2d 636, 640, and citations; Bell v. Pierschbacher, 245 Iowa 436, 446, 62 N.W. 2d 784, 790; Hass v. Kaster, 246 Iowa 48, 50, 66 N.W.2d 878, 879. See also annotation, 8 A. L. R.2d 1100, 1101.

It is true defendant's husband was not an incompetent witness as to the conversation, above referred to relative to the bonds, between decedent and defendant in which he took no part. Carlson v. Bankers Trust Co., 242 Iowa 1207, 1212–14, 50 N.W. 2d 1, 4, 5, and citations; Annotation, 27 A. L. R.2d 538, 543. However, the husband's testimony he took no part in the conversation is a proper matter to consider in weighing his evidence as to what was said and in passing upon his credibility. Carlson v. Bankers Trust Co., supra, and citation.

On at least two prior occasions decedent caused one of her certificates of bank deposit to be made payable to herself or, respectively, her daughter Ruth or son John. In May 1946 a "C. D." for $500 was made payable to decedent or Ruth Swab. Four years later another C. D. was made payable to decedent or the son John. In each instance this was done so Ruth or John could withdraw small amounts if needed for the mother's use. Apparently no one intended or believed either arrangement was for any purpose other than to suit the mother's convenience in withdrawing necessary funds. If the testimony defendant was incompetent to give under section 622.4 is disregarded, the conclusion is warranted that decedent had a like purpose in mind in the transaction of June 2, 1956.

The daughter Ruth, two sons, one of Matt's daughters and plaintiff himself, who is clerk of the district court, all testified to one or two conversations with defendant after her mother's death, quite inconsistent with the contention defendant has an interest in the bank deposit or bonds except as an heir of her mother. Although defendant denied the other witnesses' version of these talks her denial is somewhat equivocal and the trial court was convinced defendant then conceded a division of these assets was proper. During one or the other of the two conversations among these heirs an argument arose as to whether Matt's daughters were entitled to a share of the assets here in controversy. Defendant contended they were not—the others that they were.

It is significant that defendant testified: "Mother used to say the money was going to go in five shares, not six, but after she put it in my name she never mentioned anything about it. She told me the money was to be mine to take care of her." Thus, according to defendant her mother evidently intended, in speaking of her money before the transactions in controversy occurred, a division of the money among her living sons and daughters.

We have frequently pointed out the matter of independent advice to the transferor is an important consideration where there is a confidential relation between him and the transferee who is in a position of dominance. Barber v. Powell, supra, 248 Iowa 785, 793, 82 N.W.2d 665, 670, and citations. We have held, however, lack of such advice is not necessarily fatal to the validity of a deed where a confidential relation exists between the parties thereto. Daniels v. Fackler, 244 Iowa 1163, 1168, 58 N.W.2d 309, 312.

There is no evidence Mary had independent advice regarding either transaction involved here. There is no showing any of her brothers or her sister was informed of the plan to make defendant a joint payee of the bank account or the bonds. All of them lived very close to the home place and defendant could easily have told any of them of the plan. It is true the mother herself could have sought advice from any of the others, especially the son John who was a very frequent caller. But availability of independent advice is not the equivalent of the advice itself. See in this connection Woolwine v. Bryant, 244 Iowa 66, 71, 54 N.W.2d 759, 762, a case much like this.

This language from Johnson v. Johnson, 196 Iowa 343, 348, 349, 191 N.W. 353, 355, may be repeated again: "It is a rare case where the dominant individual in a fiduciary relation can sustain a gift to himself by the one who is dependent upon him. Whereas the defendant had assisted her husband in his few matters of business before his illness, she had now, by his illness, become his sole dependence. If someone else had sought to obtain a conveyance of his property, she would have been his independent adviser, and would have protected him against ill-advised action. Inasmuch as she became the beneficiary of this transaction, he was necessarily deprived of her help and advice.

In such a case, equity inquires, Who was his helper? Did he have any? Did he have independent advice, legal or otherwise? If his wish had been to refuse the gift, was there anyone to stand for him and to put forward the refusal? It is incumbent upon the defendant to make some answer to these questions."

And this from Merritt v. Easterly, supra, 226 Iowa 514, 530, 284 N.W. 397, 405, also bears repeating: "The courts must scrutinize with jealous vigilance transactions between persons sustaining relations of trust and confidence, to the end that the dominating member shall conduct himself with * * * utmost good faith."

Precedents cited by defendant have been carefully considered. Some of them are will contests based in part on the claim of undue influence, not cases like this involving inter vivos transactions. The presumption of overreaching in such transactions, where the dominant person in a confidential relation obtains an advantage from the subservient one, does not apply to testamentary gifts. Graham v. Courtright, 180 Iowa 394, 406–416, 161 N.W. 774, 778–781; In re Estate of Brooks, 229 Iowa 485, 493, 294 N.W. 735, 739, and citations; In re Estate of Rogers, 242 Iowa 627, 635, 47 N.W.2d 818, 823.

Factual differences in other precedents cited by defendant which reach a result contrary to ours here are such that they are not controlling. We have frequently said the decision in controversies of this kind depends largely upon the facts of the particular case. Barber v. Powell, supra, 248 Iowa 785, 793, 82 N.W.2d 665, 670.

V. Our decision is entirely consistent with such precedents as In re Estate of Murdoch, 238 Iowa 898, 29 N.W.2d 177; McManis v. Keokuk Sav. Bk. & Tr. Co., 239 Iowa 1105, 33 N.W.2d 410; In re Estate of Murray, 236 Iowa 807, 20 N.W.2d 49, and Hill v. Havens, 242 Iowa 920, 48 N.W.2d 870. These Murdoch, McManis and Hill cases hold that where there is a clear and unambiguous written contract between a bank and its depositors providing for joint ownership of a deposit the contract cannot be varied by parol evidence *in the absence of plea and proof of fraud, duress or mistake*. And the Murray and Hill decisions apply the same rule to United States bonds held

in joint ownership under treasury regulations which become part of the contract.

In the present case when defendant's name was added to the bank account she signed her name and that of her mother, the latter making her own mark—an "X"—to a signature card, which is practically identical with those in Hill v. Havens, supra, set out at pages 921, 922 of 242 Iowa, and pages 871, 872 of 48 N.W.2d, and in McManis v. Keokuk Sav. Bk. & Tr. Co., supra, set out at pages 1107, 1108 of 239 Iowa, and page 411 of 33 N.W.2d.

Both Hill v. Havens and In re Estate of Lundvall, 242 Iowa 430, 434, 435, 46 N.W.2d 535, 537, make it clear that parol evidence is properly received in such a case as this where there is a plea and proof of fraud and overreaching arising from a confidential relationship. On the authority of the Murray case, supra, Lundvall argued that the state courts could not void the contract between joint owners of United States bonds and the Federal Government. Our opinion holds: "But the trial court did not attempt to void the contract; it merely ordered Samantha to account for the value of the bonds. The Murray case is not in point. Conceding, as we have pointed out we must, that the trial court properly found a confidential relationship during the course of which the dominant party induced the inferior one to execute a contract with the United States Government which gave the wrongdoer an unfair advantage, it would be a reproach to the law if it could only fold its hands and say that nothing could be done."

Hill v. Havens, supra, in referring to the exception to the rule of our earlier precedents where there is fraud, duress or mistake, states (page 932 of 242 Iowa, page 877 of 48 N.W.2d): "This exception covers cases where, as in In re Estate of Lundvall, 242 Iowa 430, 46 N.W.2d 535, a claim of confidential relationship was made and established. The element of fraud, constructive at least, then enters into the case. Curtis v. Armagast, 158 Iowa 507, 520, 138 N.W. 873, 878. No such claim is made in this case."

In re Guardianship of Munsell, supra, 239 Iowa 307, 318, 319, 31 N.W.2d 360, 366, also holds, where the presumption of overreaching arising from a confidential relationship was not

rebutted, a joint bank deposit agreement was invalid, the account was the property of the original owner and the dominant party had no right or interest therein. See also annotation, 51 A. L. R.2d 163, 170, 171.

McManis v. Keokuk Sav. Bk. & Tr. Co., supra, 239 Iowa 1105, 1109, 33 N.W.2d 410, 412, points out that the claim of fraud, duress or undue influence based upon a confidential relationship was not an issue in the case and would not be considered.

The decree is—Affirmed.

All JUSTICES concur.