MARY M. KUNZ, appellant, v. CHARLES A. KUNZ, appellee.

No. 51155.

(Reported in 125 N.W.2d 226)

December 10, 1963.

McMahon & Cassel, of Algona, for appellant.

Hutchison, Hutchison & Andreasen, of Algona, for appellee.

Larson, J.—This suit to set aside a quitclaim deed which

purported to convey plaintiff's undivided one-third interest in approximately 600 acres of farm land located in Nevada Township, Palo Alto County, Iowa, but reserving to herself a life interest therein, was brought by Mary M. Kunz, a widow, against her grantee-son, Charles A. Kunz, on the grounds that at the time of its execution there was a confidential or fiduciary relationship between the parties and that the deed was executed as a result of undue influence, fraud and duress on the part of defendant, and that there was no proper delivery of the deed to him. Defendant's answer denied the alleged relationship, the undue influence, the failure to deliver, and the failure of consideration. The trial court held the evidence insufficient to establish a confidential relationship or that the deed was not properly executed and delivered, or that it was procured by fraud, duress or undue influence, and dismissed plaintiff's petition. She appeals.

I. Perhaps the principal question presented by this appeal is whether at the time the deed was executed on September 15, 1960, a confidential or fiduciary relationship existed between the plaintiff and defendant in which he was the dominant person and she the subservient one. Most of plaintiff's testimony came from herself and six of her children, all of whom were interested parties. Defendant's testimony was given by himself, his wife, friendly neighbors, a former Supreme Court Judge, a doctor, and some relatives who were not directly interested. Although our review is de novo, we should give weight to the trial court's findings, for it saw and heard these witnesses.

II. Plaintiff, of course, had the burden to show by clear proof the existence of the confidential relationship claimed by her. Groves v. Groves, 248 Iowa 682, 82 N.W.2d 124; Luse v. Grenko, 251 Iowa 211, 100 N.W.2d 170; Barber v. Powell, 248 Iowa 785, 792, 82 N.W.2d 665, 669. The law concerning confidential relationships and their effect upon the transactions between the parties to them, we have often said, is too well settled to require much discussion. It is not the law but the facts that trouble the courts in such cases. Foster v. Foster, 223 Iowa 455, 459, 273 N.W. 165; Thorne v. Reiser, 245 Iowa 123, 129, 60 N.W.2d 784, and citations. As is pointed out in the latter

case, the relationship exists "when one has gained the confidence of the other and purports to act or advise with the other's interest in mind." Restatement of the Law of Trusts, section 2(b), page 8; Popejoy v. Eastburn, 241 Iowa 747, 757, 41 N.W.2d 764; 37 C. J. S., Fraud, section 2c(2), page 213, note 1; 17 C. J. S., Contracts, section 132.

To determine for ourselves whether the evidence clearly shows such a relationship existed at the time the deed was executed, we turn to the much-too-lengthy record. Charles J. Kunz, plaintiff's husband, whom we shall refer to as C. J. Kunz herein, after an extended illness, died on August 27, 1960, and was buried August 30. On September 2 plaintiff and defendant called at the office of Attorney Guy L. Carmichael in Emmetsburg, who had done work for C. J. Kunz and had drawn decedent's last will and testament. The will was taken to the county clerk's office where it was filed and read. At that time the defendant expressed his dissatisfaction with its terms, which in substance left to the widow a one-third share in the farm and divided the balance of the land in equal shares to his seven children. By virtue of joint ownership, she also received some $20,000 in cash and bonds. Defendant said he expected a special bequest from his father in view of the fact that he alone had remained at home and had assisted in the accumulation of the property owned by his parents. Plaintiff's witness, Mr. Carmichael, explained the bequest and her interest in the estate of her deceased husband. He explained that property was hers and that she could do what she wanted to with it. Mr. Carmichael testified the plaintiff, Mrs. Kunz, then voluntarily said: " 'Well, Charles * * * you are dissatisfied. I can make up something to you out of my share of the property * * * I can give you something.' " He further testified that defendant, prior to that time, had not suggested that his mother do something for him out of her share. He did not recall advising the widow that she could deed or will her share, but said he may have so advised her.

Apparently this turn of events so upset defendant that he became ill and he complained about the will to two of his sisters. While the record is silent as to any further discussion

between plaintiff and defendant as to whether or not she would help her son, it seems reasonable to believe that she did in some way give him the impression that she would do so. At any rate on the morning of September 15 there was a conversation between them at the breakfast table. Plaintiff, being aware of the possibility of Charles filing a claim in his father's estate for extra services rendered, asked him if she gave him her share if he would file such a claim. He said he would not, but wanted a written and not a verbal promise, for he claimed his father had promised him such aid but "did not keep it." A discussion followed as to how this could be done and Charles suggested they consult Mr. L. E. Linnan, an attorney at Algona, who had been on the Supreme Court and would know what could be done. The plaintiff asked defendant to call Mr. Linnan and make an appointment, which he did.

That afternoon at about 1:30 the parties, with defendant's wife, Millie, called at Linnan's office in Algona, Iowa. Mr. Linnan was advised of C. J. Kunz's death and of the reading of the will, a copy of which Charles handed to him. Linnan testified Mary Kunz, the plaintiff, in substance told him she and her husband had promised Charles they would help him so he could buy the home farm, or another one, but the will failed to make any provision for such aid. She told him that Charles had stayed with them and had helped them pay off the farm mortgage and that she wanted to compensate him somehow. She asked if she could turn over her interest in the farm to Charles. She also pointed to the fact that during the past two or more years Charles had helped take care of the ailing C. J. Kunz when she could not do so alone, and that he should be paid for that service.

In this connection it is interesting to note that C. J. Kunz had given his son Alvin a small farm some years before, although Alvin had spent little or no time helping his father acquire the home farm, and had never lived on it.

Mr. Linnan advised Mrs. Kunz that she could turn over her interest in the farm to Charles, and testified that she said she wanted to do it. After examining the will, Linnan expressed the opinion it could not be upset and doubted that

Charles could successfully pursue his entire claim against the estate of C. J. Kunz, although he could try. Plaintiff then asked Charles if she transferred her interest in the farm to him, whether he would file the claim, and he said he would not. In the further discussion Charles and his wife agreed that Mary Kunz could live and have her home with them for the rest of her life without charge. Mr. Linnan then prepared a quitclaim deed and an affidavit explaining the reasons for its execution. He stated in doing so he was acting as attorney for Mary Kunz. He further denied he ever acted as attorney for Charles, although he stated the bill for his services on this date was directed to the children of C. J. Kunz and was paid by Charles.

After these instruments were prepared, they were read to Mary Kunz, and Linnan testified she said that was just what she wanted to do. Although plaintiff claims otherwise, maintaining that she did not know what was being done, Linnan insisted that Mary Kunz did most of the talking and that from her reactions and conversation he was sure she heard and understood every word he said to her and knew what she was doing. He further testified that from his contact with and observation of Mary M. Kunz, whom he had not known before, she was in his opinion a composed elderly lady, not emotionally upset or agitated at the time, and knew what she wanted to do and what she wanted him to do.

After the quitclaim deed and the affidavit, Exhibits 3 and 4, involved herein, were read to her, she signed them, and Linnan took her acknowledgment and said he gave them to defendant. There is some conflict in the testimony as to whether Linnan gave them to Charles, or back to plaintiff who then gave them to defendant, but we think that is not vital here for it is clear they were actually handed to defendant by plaintiff or by Linnan acting under her direction at that time. The deed was recorded by defendant on the 28th of February, 1961.

III. Of course the burden to prove nondelivery of a recorded deed rests on the party so alleging, and the evidence thereof must be clear and satisfactory or, as we have sometimes said, clear, satisfactory and convincing. Byers v. Byers, 242 Iowa 391, 411, 46 N.W.2d 800, 811, and citations. Circum-

stances may overcome the presumption of delivery. Jeppesen v. Jeppesen, 249 Iowa 702, 709, 88 N.W.2d 633. Unless we find herein clear and satisfactory proof of facts to the contrary, it must be concluded that there was a proper delivery of this deed. Arndt v. Lapel, 214 Iowa 594, 243 N.W. 605. Obviously, the conveyance was of plaintiff's interest in that land.

Plaintiff recalls she was given a dollar by defendant, although she claims she did not know what it meant at the time. Exhibit 3, the quitclaim deed involved, expressed the consideration as "ONE DOLLAR and other good and valuable considerations." It provided: "Grantor reserves the use, right, income, and beneficial possession of the above described real estate for the term of her natural life." The affidavit Exhibit 4, executed at the same time, stated it was "'in explanation of a certain quitclaim deed which I have this day executed and delivered to my son, Charles A. Kunz * * * covering all of my interest in lands inherited by me from my deceased husband, Charles J. Kunz * * *.'" It further stated: "'I have made this deed for the reason that my deceased husband had promised to help my son, Charles A. Kunz, purchase a farm in consideration of his work and labor performed on behalf of my deceased husband after he had attained the age of 21 years and in consideration of the care and services rendered by him to my deceased husband and myself during the last two years of my husband's life and after we closed our house in Emmetsburg, Iowa, and made our home with my son, Charles A. Kunz.'" It also stated it was in consideration of defendant's agreement not to file claim against her husband's estate for any services or moneys that may be owing him, and in recognition of defendant's agreement that she could live with them the rest of her life without charge of any kind.

Plaintiff now claims she was so depressed and grief stricken at the time, due to her husband's long illness and death, that she did not know what she was doing and did not fully comprehend its significance until some time thereafter when she asked defendant what she had done. Then she said she told him she did not want it that way and asked him to return the papers. We do not know what occurred to change her mind, for there is no evidence that she told anyone of the deed until she

so advised her son Edmund sometime in February 1961. Apparently, after that transaction she further considered the effect of it on her ability to leave any interest in land to her other children. Upon reflection, she found herself in the unenviable position of having six of her seven children dissatisfied with what she had done to meet what she considered a valid obligation of her deceased husband and herself. Under the deed's reservation she lost no immediate property right except the right to deed or will this undivided one-third interest.

One other matter relating to plaintiff's mental capacity and business ability at that time should be mentioned. It appears that when she and defendant were advised that the will appointed a bank as executor, she expressed displeasure and took the position that since she and Edmund and Charles had been operating the farm during the past two years, money should not be paid to a bank for doing the same thing as executor and trustee under the will. Although it is now contended this was Charles's idea, it appears when they were in Mr. Linnan's office he was asked how this expense could be avoided, that he advised her and drew an instrument entitled "Objections and Recommendations", which was to be signed by all the heirs and filed in the estate matter prior to the probate of the will. Plaintiff signed this instrument and personally requested her children to do so, which they did. As a result, the bank declined to serve and the court appointed the plaintiff, Charles and Edmund coadministrators-with-the-will-annexed to serve instead of the bank. No one questioned plaintiff's ability to serve in that capacity, and indeed her services were apparently deemed necessary. It seems a bit farfetched now to charge defendant with this decision and to cite it as evidence of the influence he exercised on plaintiff, or as a betrayal of the trust all parties placed in him to conduct plaintiff's affairs. It is as reasonable to conclude it demonstrated their confidence in plaintiff's business ability and interest and an election not to rely solely on the decisions of either Charles or Edmund.

We have related the only specific evidence as to confidential relationship. It is true plaintiff's four daughters and her other two sons testified generally to the proposition that plaintiff had

no business experience and trusted defendant, that he advised her as to business matters, and that she never refused to follow his suggestions. It is also true that since she and her husband moved back to the farm in 1958 she depended upon Charles for errands and transportation and often called on him for aid in taking care of C. J. Kunz, but there is no evidence he ever wrote a check on his mother's account, did banking, or handled any personal matters for her, or that she did not sign the checks for any obligations of herself or her husband. On the other hand, the evidence is clear that most expenditures of a major nature, such as an addition to the farmhouse, an implement shed, funeral expenses, etc. were incurred and paid for after consultation with another son, Edmund, and defendant and after they had checked the accuracy of the accounts. In fact, it is clear that during this period plaintiff had available and used the independent advice and counsel of all her children, who often came home over weekends. We cannot find in such evidence a clear showing that plaintiff solely depended upon defendant for help and advice. Indeed it is clear that she did not always follow it, for when Charles wanted a separate house moved on or built upon the home farm when she and C. J. moved back in 1958, she insisted on a remodeling, decided which room would be theirs, and dictated the arrangement. Even then she did not rely solely upon Charles to secure the improvements, but she, Edmund and the defendant together went to Carmichael's office and had a power of attorney drawn for the *two* boys so they could legally proceed to place improvements on the farm. It is true this power of attorney was signed by plaintiff along with her husband who owned the farm and who was unable to look after such business himself, but we are satisfied under the testimony that it was done to pacify C. J. Kunz and was not intended to cover control over plaintiff's property. No attempt to do so was ever made, but it does appear that at plaintiff's insistence C. J. Kunz's business bank account was changed to a joint account so plaintiff herself could handle the money matters and sign the checks, which she did exclusively.

Admittedly, there was little need for her to tend to business

matters. When her husband was able, he took care of them. During the last two years, with the exception of one gas bill, their fuel and food bills were paid by Charles. Although they continued to rent the farm to Charles on a 50-50 crop share basis, as it had been when C. J. was able to handle the matter, plaintiff was consulted and gave her advice to Charles as to crop rotation, improvements, etc. Indeed she may have been the dominant party.

We are convinced, as was the trial court, that plaintiff's showing of a confidential or fiduciary relationship wherein defendant was the dominant party falls far short of the clear showing necessary for a determination of such a relationship at or near the time of the execution of this deed. While it has been said such a relationship is often present in family relationships, and assumptions are permissible in cases where the parent is aged, feeble, physically handicapped, or is mentally weak, it is always pointed out in such cases that transactions between them are not considered fraudulent, induced by duress, or the subject of mistake, merely because they are between parent and child. Burns v. Nemo, 252 Iowa 306, 312, 105 N.W.2d 217; 39 Am. Jur., Parent and Child, sections 98, 99 and 100, pages 743–747.

The question of confidential relationship is, of course, an important one. The gist of the doctrine is the presence of a dominant influence under which the act is presumed to have been done. While we have been slow to define the precise limits of such a relationship, generally, as we have stated, it may be said to exist when one person has gained the confidence of another and purports to act or advise with the other's interest in mind. It may exist although there is no fiduciary relationship, but it does not arise solely from blood relationship. The purpose of the doctrine is to defeat and correct betrayals of trust and abuses of confidence. Oehler v. Hoffman, 253 Iowa 631, 113 N.W.2d 254; Groves v. Groves, supra. Kind and considerate treatment which induces affectionate regard for another, we have said, raises no presumption of confidential relationship, especially in the absence of some showing that by this means a dominant influence was obtained. Groves v. Groves,

supra; Albaugh v. Shrope, 197 Iowa 844, 849, 850, 196 N.W. 743; Hess v. Pittman, 214 Iowa 269, 276, 242 N.W. 113.

Here there was undoubtedly a mutual trust and affection between plaintiff and defendant, but no more so than that between her and the other children. She often consulted with them, not in the presence of defendant or his wife. We find little more than a normal family relationship proven, and nothing to justify any presumption that the conveyance was obtained by fraud or undue influence arising through a dominant influence exercised by defendant. Numerous decisions support this view. The leading case, of course, is Curtis v. Armagast, 158 Iowa 507, 138 N.W. 873. Others are set out in Groves v. Groves, supra, 248 Iowa 682, 82 N.W.2d 124. We think appellant's claim of confidential relationship is much weaker than a like claim in Barber v. Powell, supra, 248 Iowa 785, 82 N.W.2d 665, and Groves v. Groves, supra, in which a deed was upheld.

IV. The rule in this jurisdiction is well settled that where a confidential relationship is found to exist between a grantor and a grantee, a presumption against the validity of the conveyance arises, and the burden of upholding the conveyance as to its fairness passes to and rests upon the grantee. Curtis v. Armagast, supra, 158 Iowa 507, 138 N.W. 873. Proof by grantee to overcome this presumption, as we have said, must be clear and convincing. Daniels v. Fackler, 244 Iowa 1163, 1165, 58 N.W.2d 309; Woolwine v. Bryant, 244 Iowa 66, 54 N.W.2d 759; 26A C. J. S., Deeds, sections 193, 208; 16 Am. Jur., Deeds, sections 40, 392 and 402.

However, where such a relationship has not been proven, the burden of establishing fraud, duress or undue influence and its elements, remains with the complainant, and in order to set aside the instrument she must by clear and convincing evidence prove her allegations. In the case at bar the trial court held plaintiff had failed to carry this burden.

On the claim of mental and physical incapacity plaintiff had the burden to show by clear, satisfactory and convincing evidence that at the time she made the deed she was incapable of hearing or understanding in any reasonable manner the

nature of the transaction and its consequences and effects upon *her* rights and interests. Groves v. Groves, supra, and cases cited therein, loc. cit. page 694 of 248 Iowa.

Although plaintiff was in a period of mourning for her deceased husband, was then 80 years of age, and somewhat concerned about the effect the will had on her son Charles, we are agreed the showing of mental incapacity is insufficient to justify setting aside the deed on this ground. Defendant and his wife, an old friend whom plaintiff met on the streets of Algona on September 15, and Mr. Linnan, all expressed the opinion that at that time she was mentally alert and in excellent mental and physical condition. While there was evidence of plaintiff's hearing difficulties and her use of a hearing aid, the evidence is convincing that she could hear when directly spoken to and that she heard and understood the material conversations involved herein. It is a far less showing than that made in the cases of Stephenson v. Stephenson, 247 Iowa 785, 788, 74 N.W.2d 679, 681; Else v. Fremont Methodist Church, 247 Iowa 127, 147–151, 73 N.W.2d 50, 61–63, and citations; and Foster v. Foster, 223 Iowa 455, 273 N.W. 165.

Quite a little reliable evidence, much of it undisputed, shows that at this time plaintiff carried on her usual social and farm activities, went on extended trips to visit, showed no more than normal grief at losing her mate of over 50 years, and that she carried on intelligent conversations with her friends. It is true, others said after her husband's death she was not herself, that she was quiet, was so hard of hearing that when playing cards she often asked what trump was, but we hardly think these observations tended to prove substantial mental or physical disability at this time in a clear and convincing manner.

V. Appellant contends she had no independent advice of counsel at the time of the conveyance, and that there was an overreaching by defendant on that occasion. As proof, she offered evidence that when she asked defendant to return the deed, and he refused, the other children accompanied her to Mr. Linnan's office to ask what could be done. They all testified Linnan told them he thought she was not acting freely on that occasion, or words to that effect, and, although he refused to

represent her in this action, told her it would be easy to set it aside. Such testimony seemed as incredible to the trial court as it does to us. Mr. Linnan strongly denied any such statements, but said he advised them he never was concerned in the least about that deed. Apparently there was a misunderstanding as to Linnan's statements to these interested parties, and we give little weight to that evidence as proof of a fraud or undue influence being practiced upon plaintiff. It seems more reasonable that plaintiff considered herself indebted to defendant, directly and morally, and was trying, with the aid of this reputable and highly esteemed lawyer, to meet the obligation fairly. The fact that Charles and his wife were present did not infer an unwholesome influence, for they spoke seldom, and Mr. Linnan himself admitted that before he let her sign the papers he more or less in jest asked plaintiff if she "wasn't being talked into something." Her answer was a positive "No".

That she felt indebted to defendant there can be no doubt. The evidence is quite conclusive that defendant, since 1938, had stayed with his father and mother when they purchased and moved upon this 600-acre farm. It further appears that C. J. Kunz paid him no wages; that sometime in 1940 or 1942 a small one-room house was moved onto the farm for the use of Charles and his family, which included three small children, and that they occupied it until 1948 when Charles took over all the farming operations. During the period from 1938 until 1948 Charles and his wife, and C. J. and plaintiff, worked together on this farm and only occasionally was extra help hired. They all worked hard paying for the farm during that period, and C. J. Kunz accumulated sufficient cash to purchase and pay for a town property in 1948. There is evidence that at the beginning of this relationship Charles became ill, had an operation for ulcers, and could not do hard work for several months. As he had no money, plaintiff paid for his operation and his father sold some steers belonging to Charles to pay the hospital. There is other evidence, largely undenied, that early in the farm operation Charles was given $3.00 a month from the cream check and was furnished room and board by his father. Later Charles rented another 80 acres, farmed it with his father's machinery,

and took the income. Still later he was permitted to farm 152 acres of the home farm and keep the income. During that period Charles purchased a combine and did custom work for others. He combined for his father without compensation. The trial court observed there was nothing in the record to indicate that any income Charles received was given or accepted as full payment for the services rendered his father by himself and his wife, but that it indicated he was permitted to take only sufficient income to meet his family expenses. His father tended to all business affairs and took sole charge of the home farm income. Charles purchased a tractor shortly before his folks retired. Although his parents left their machinery on the farm, it was old and was mostly of the horse-drawn type. Charles soon replaced it with modern machinery of his own.

Part of C. J. Kunz's machinery is listed in the estate inventory. We are satisfied neither appellee nor his wife had been fully compensated for the years of service rendered plaintiff and her husband, nor that the parties ever considered the account balanced. We think the record reasonably bears out the contention of defendant that plaintiff and her husband, when he was well, recognizing this obligation, had told Charles that they would help him buy the home place or another farm as compensation for the help he had given them. This alone would justify the conclusion that the deed is supported by an adequate consideration and that it was sufficient to reform or enforce this deed to the intended land. Dolph v. Wortman, 185 Iowa 630, 168 N.W. 252. It is reasonable to believe that is what plaintiff told Mr. Linnan and that is part of the obligation she felt she should liquidate by conveying her one-third interest to defendant. It was a substantial consideration.

But this was not all the consideration disclosed by the record. In 1948 plaintiff and her husband moved to town. C. J. Kunz, apparently without compensation to Charles, kept considerable livestock on the farm and often came out to take care of it and do other landlord chores thereabouts. In 1954, when his health began to fail, C. J. sold most of his stock. In 1958 he had both physical and mental difficulties and became such a problem for plaintiff that she needed help to care for him. Again

Charles was called upon, and there was a conference between plaintiff, Edmund and defendant, wherein it was decided the town house should be sold and the farmhouse remodeled to accommodate Mr. and Mrs. C. J. Kunz. This was done and Charles took care of most of their bills. He helped protect his mother from injury due to his father's mental condition. Two years later, in July 1960, C. J. Kunz became such a problem they could no longer care for him on the farm, and plaintiff asked Charles and his wife to see if they could get him into a rest home. Charles's wife called for her, and arrangements were completed. At the rest home C. J. Kunz required constant restraint by straps. He suffered a stroke about August 25, was removed to a hospital, and died August 27, 1960. During the period of over two years while in Charles's home, someone was required to watch his father at all times, and while plaintiff did so most of the time, when she attended affairs of her own, Charles and his family took over. No compensation was ever given Charles or his wife for these services, and none of the other children accepted any responsibility for his care and welfare during those hectic years for plaintiff and her husband. We think they should not now complain when defendant is compensated as seems to have been intended, and, although the value of this interest conveyed may be some $30,000, it does not appear unconscionable.

VI. Having carefully considered all the evidence herein, we conclude there was insufficient proof the deed was procured by actual fraud or undue influence of Charles Kunz, that the deed covering plaintiff's undivided one-third interest in the land devised her by her husband's estate was properly delivered to Charles, and that the showing of inadequate consideration therefor was insufficient. The judgment of the court dismissing plaintiff's petition must be and is affirmed.—Affirmed.

All JUSTICES concur.