DR. CONRAD BURNS, executor of estate of Abe Burns, deceased, appellant, v. BETTY F. NEMO et al., appellees.

No. 50016.

(Reported in 105 N.W.2d 217)

SEPTEMBER 20, 1960.

REHEARING DENIED DECEMBER 16, 1960.

Kalman Musin, of Des Moines, for appellant.

Hiram S. Hunn, of Des Moines, for Betty F. Nemo, appellee.

Ben C. Buckingham, of Des Moines, for Highland Park State Bank, appellee.

Gibson, Stewart & Garrett, of Des Moines, for Central National Bank & Trust Company, appellee.

No appearance for Iowa-Des Moines National Bank, appellee.

PETERSON, J.—This is an action in equity by Dr. Conrad Burns, executor of the estate of Abe Burns, deceased. It is against his sister, Betty F. Nemo, demanding transfer to the estate of three joint tenancy bank accounts, established between her and her father. Plaintiff and defendant were the only children of decedent.

Mr. Burns died testate September 13, 1956, at the age of 70. In September 1955 he established two joint tenancy bank accounts with defendant, and in February 1956 a third account. The signed cards were in the customary joint tenancy form, with ownership in the survivor.

The executor claims there was a confidential relationship between the father and daughter, and that defendant by fraud, duress or undue influence had caused her father to name her as joint tenant in the bank accounts. He also claimed that the joint tenancy was created only for the convenience of her father while alive, and not as a transfer of ownership after his death.

The trial court decided in favor of defendant. Plaintiff has appealed.

I. Abe Burns was born in Russia, later moved to Poland, and came to this country when a young man. The evidence established that he was an honest, thrifty, and, as one witness testified, a "smart" man. While he did suffer during his later years from diabetes, and some eye difficulty, he maintained his mental faculties unimpaired until his death. He was a tailor.

Some years after Mr. Burns came to Des Moines he estab-

lished his own tailor shop at Ninth and Walnut Streets. He maintained this shop for twenty years. A few years ago the building was torn down, and he then secured employment in the tailoring department of the Frankel Clothing Store, where he worked until two weeks before his death.

He purchased a home in Des Moines, in which he lived for about 35 years. His son, Conrad, received a college education; Liberal Arts Course at Drake University; Osteopathic medical course at Still College.

While attending Drake, Conrad lived at home and received some financial help from his father. He attended Still College after his return from the service, and received help from the G. I. bill, from his wife, who was working, and from his work as an interne. When Conrad established himself in his profession at Adair his father gave him $500 toward buying equipment for his office.

Betty finished high school, but did not go to college. She worked for some years until she married Morris S. Nemo. After her mother's death in 1946, at the request of her father, she moved into the family home with her husband and little daughter. They maintained this household of four until her father's death on September 7, 1956. The relationship in the family was peaceful and happy. By agreement Mr. Nemo paid for the groceries and telephone, and Mr. Burns paid the taxes and other utilities. Betty was a good housekeeper. As one neighbor testified, she kept the house spotlessly clean. She gave her father such help as he needed at his age.

Mr. Burns had accumulated the following bank accounts: $611.06 in checking account in Highland Park State Bank; $4000, and some interest, in savings account in Iowa-Des Moines National Bank; and $4450, and some interest, in savings account in Central National Bank and Trust Company.

In the last part of August 1955 Mr. Burns brought home joint tenancy cards from the latter two of the above named banks, and asked Betty to sign the cards with him. She did and her father returned them to the banks. The bank records show they were deposited in the banks on September 7, 1955. He followed the same procedure with reference to the checking account in Highland Park State Bank in February 1956.

The joint tenancy agreement signed by Mr. Burns and Betty with the Iowa-Des Moines National Bank was as follows: "The undersigned, joint depositors, hereby agree, each with the other and with the Iowa-Des Moines National Bank, that all funds heretofore and hereafter deposited to the credit of this account are, and shall be, the joint property of the undersigned, subject to the order of either. The balance upon the death of either shall be the sole property of the survivor and shall be payable upon his order. (Signed) Abe Burns. (Signed) Mrs. Betty F. Nemo. Date Sep. 7-55."

The signatures were fully identified. There was a slight variation in the wording of the agreements with the other two banks, but in substance they were similar. They both contained joint tenancy and survivorship provisions.

Betty testified she knew about the checking account, because she wrote checks for her father's signature from time to time at his request. He was not able to read or write English, except to sign his name. He could read and write Polish, and could read Hebrew. She also testified he did not discuss any details or amounts with reference to the joint tenancy cards with her. She stated on cross-examination:

"Q. Did you think that you should read those to him? A. I felt that if he brought the cards out for me to sign he knew what he was doing."

Mr. Burns' brother and sister-in-law testified decedent had talked to them about equal division of his property, after leaving the home to Betty. On the other hand, Mrs. Beulah Logan, who worked at Frankels with Mr. Burns, testified "he confided that he had made out a will leaving everything to his daughter because he had put his son through college and he thought that was all he owed the son."

Plaintiff testified, but most of his testimony was not admissible, because of his incompetency, under section 622.4. At any rate he had no knowledge about the joint tenancy cards or the bank accounts.

Some neighbors testified that decedent was a man of positive mind, who would do as he pleased, without interference by others; even his children.

Decedent's son-in-law testified, but all he knew was that the joint tenancy cards had been around the house for a few days —he had no knowledge of the bank accounts nor what his father-in-law wanted to do.

Decedent executed a will December 6, 1951, which was duly filed and probated, under which he left his home and furnishings to his daughter, Betty, and any residue in equal shares to his son and daughter. Conrad was appointed executor.

According to the inventory, his estate, including life insurance and government bonds, both payable to the two children in equal parts, totaled $24,983.88. The debts amounted to about $1100. The house and joint bank accounts were listed at $16,560.06. As to all other property the will was effective as to equal division between the two children, above costs of administration.

II. It is important that we first consider whether a fiduciary or confidential relationship existed between decedent and his daughter.

The terms "fiduciary" and "confidential" relationship are often used interchangeably, but there is some distinction. A person holding the relationship of a fiduciary has a duty to act for the cestui's benefit within the scope of the relationship. For example, guardian and ward, agent and principal, or attorney and client. A fiduciary relationship can exist without the presence of a confidential relationship.

A confidential relationship is present when one person has gained the complete confidence of another, purports to act with only the interest of the other party in mind, and discards any selfish advantage for himself. It is particularly present in family relationships. Johnson v. Johnson, 196 Iowa 343, 191 N.W. 353; Merritt v. Easterly, 226 Iowa 514, 284 N.W. 397; Woolwine v. Bryant, 244 Iowa 66, 54 N.W.2d 759.

Whether or not there was a confidential or fiduciary relationship between the father and daughter in this case controls the matter of determining what party carries the burden of proof. If no such relationship existed, plaintiff had the burden. If such relationship existed, defendant had the burden of proving the absence of fraud, duress or mistake.

**312**

■ As to parents and children there are some assumptions to be considered. Normally, when all parties are in good health and vigorous mentally and physically, the parent is considered the dominant personality. This assumption disappears when the parent has become old and feeble, in bad health, or weak mentally.

■ Transactions are not considered fraudulent, induced by duress, or the subject of mistake, merely because they are between parent and child. The circumstances of the transaction, and the condition of the parties must be carefully considered, to decide the presence or absence of a fiduciary or confidential relationship. 39 Am. Jur., Parent and Child, sections 98, 99 and 100, page 743.

■ We said in Woolwine v. Bryant, supra (at page 67 of 244 Iowa): "Where such a confidential relationship is found to exist between a grantor and a grantee a presumption against the validity of the conveyance arises, and the burden of upholding same, as to its fairness, rests upon the grantee. Proof offered to overcome this presumption must be clear and convincing. Curtis v. Armagast, 158 Iowa 507, 138 N.W. 873; Merritt v. Easterly, 226 Iowa 514, 284 N.W. 397; Wagner v. Wagner, 242 Iowa 480, 45 N.W.2d 508; 26 C. J. S., Deeds, sections 193, 208; 16 Am. Jur., Deeds, sections 40, 392 and 402; Restatement of the Law, Trusts, section 2b."

■ The evidence in this case does not establish the existence of a fiduciary or confidential relationship, with defendant as the dominant personality. While Abe Burns was 70 at his death, he had always taken care of his own business, property and bank accounts. There is no evidence in the record that he ever consulted with or even told his daughter about his affairs. No witness testified Betty was the dominant or stronger personality. All testimony offered on the subject was to the contrary.

Mrs. Agnes Shute, a neighbor, testified:

"Q. In your observation of them [decedent and Betty] together did you form any impression from what you observed that Mrs. Nemo was a controlling or dominant person controlling her father? A. Oh no, I don't think she—no, I know she didn't."

Mr. Morris Nemo, decedent's son-in-law, testified:

"Q. There has been testimony that Mr. Burns was man who was, if I may quote, set in his ways. What would your observation be in that respect? A. Yes, he was, he was set in his ways. If he made up his mind it would be very difficult to change him."

Minnie Pearl, a former neighbor and family friend for many years, testified: ·

"Q. You say that he was set in his ways? A. Well, he made up his mind and that was it.

"Q. He was pretty strong willed? A. Well, he was a smart man and he knew what he was doing, I think."

III. Since there was no confidential relationship, the fundamental question is the effect of the written agreements creating joint tenancy. We have analyzed similar agreements in several recent cases. In re Estate of Winkler, 232 Iowa 930, 5 N.W.2d 153; In re Estate of Murdoch, 238 Iowa 898, 29 N.W.2d 177; McManis v. Keokuk Savings Bank & Trust Co., 239 Iowa 1105, 33 N.W.2d 410; Hill v. Havens, 242 Iowa 920, 48 N.W.2d 870; Williams v. Williams, 251 Iowa 260, 100 N.W.2d 185.

The above cases have established a clear interpretation as to joint tenancy agreements. In all cases the joint tenancy agreements were substantially the same as the agreements in the instant case.

In In re Estate of Winkler, supra, a joint tenancy card was executed by Katherine and Carl Winkler, sister and brother. The sister died, and the question in the case was that of ownership: Did the bank account belong to her estate or to Carl? The court said: "* * * under the arrangement entered with the bank and with each other, there was created a contract of joint tenancy, expressly so designated and with all the attributes of such a relation, and under such contract the applicant [Carl] was entitled to the possession of the bankbook and the deposit." (Page 938 of 232 Iowa)

In In re Estate of Murdoch, supra, Will W. Murdoch died testate November 20, 1945. He left a checking account of $16,665.95 in Jasper County Savings Bank. A joint tenancy

card signed by both Mr. and Mrs. Murdoch had been filed with the bank in February 1942. A residuary legatee under the will contended there was no intent by Mr. Murdoch and wife to create a joint tenancy. There was some parol evidence offered to this effect.

The court said at page 903 of 238 Iowa, "* * * the wording of a clear-cut and unambiguous contract must control in construing it and rules of construction apply only where there is ambiguity." (Four cases cited.)

A quote from 9 C. J. S., Banks and Banking, section 286, in part is: "The intent of the parties may indicate and determine the right of survivorship. * * * but when such intent is evidenced by a written agreement, the question of intention ceases to be an issue and the courts are bound by the agreement."

The court held Mrs. Murdoch was the owner of the account as surviving joint tenant, and said: "* * * in the absence * * * of fraud, duress, or mistake, we are bound by the plain and expressed terms of the agreement. Extrinsic evidence tending to change this expressed intent is not competent."

In McManis v. Keokuk Savings Bank & Trust Co., supra, Mrs. Kammerer, deceased, had created a joint tenancy account in defendant bank with her son, the plaintiff.

The decision was in favor of plaintiff, this court stating: "The trial court rendered judgment for plaintiff, holding Exhibit A [the joint tenancy bank card] constituted a contract between the parties and expressed a clear intent to create a joint tenancy, that there was no competent evidence of an intent different from that indicated in Exhibit A, and that the reason behind its execution was immaterial." (Page 1109 of 239 Iowa)

In Hill v. Havens, supra, Mr. Havens had established a joint tenancy account with his wife, Eva, under agreement similar to the agreement herein. Both parties had been previously married, but had no children by their second marriage. Plaintiff is a daughter, adopted during a previous marriage. In this decision the court, through Justice Thompson, reviewed

at length the development of our interpretation of joint tenancy agreements.

The agreement was sustained, and the court stated at page 930 of 242 Iowa: "W. H. Havens chose to enter into a clear, explicit and binding contract, which established a joint tenancy relation between himself and the defendant, Eva Havens. * * * This is the rule required by well-considered and long-established legal principles * * *."

In the very recent case of Williams v. Williams, supra, we again reaffirmed the controlling rule in the following language: "* * * when a definite written agreement is made by a depositary bank with its customers, such agreement is binding upon the bank and the parties signatory, and if it is clear in its terms and meaning it cannot be changed by parol evidence except for a plea of fraud, duress and mistake." (Page 264 of 251 Iowa)

We are not ready to recede from these clear and positive definitions of the legal effect of joint tenancy agreements.

IV. It therefore becomes a question of whether defendant was guilty of fraud, duress or mistake. The trial court sustained a motion to strike all paragraphs in the petition, and amendments thereto, as to these allegations, on the basis that no evidence had been offered to support such allegations. The case is triable de novo, and the ruling of the trial court is not conclusive. However, we give substantial weight to the rulings and decision of the trial court.

An examination of the record fails to disclose any evidence as to either fraud or duress by Betty in connection with her father's bank accounts. All she knew about the accounts was that at his request she signed the joint tenancy agreements. She did not initiate nor request establishment of the accounts.

As to mistake, that could only mean that his signature was secured surreptitiously or that his physical or mental condition was such that he did not comprehend what he was doing. Appellant offered no testimony to sustain the presence of such conditions.

Appellant vigorously contends Betty was guilty of unduly influencing her father in the establishment of the bank accounts. This charge is somewhat akin to duress, but is presented from

this different angle. The record does not sustain the contention.

Abe Burns was an energetic man, with a great fund of natural ability. Under the circumstances of his life and family relationship, the provision he made for Betty was not unjust nor unnatural. He had materially assisted Conrad in securing a professional education. After his wife's death Betty had maintained a comfortable home for him during the last ten years of his life. Mrs. Shute, a close neighbor, testified:

"Q. Will you tell the court what those conversations [with Abe Burns] were? A. Well, he told me that Betty had stayed and made the home for him and he was quite pleased that she had made a home for him; he said that she did the cooking and all of. that, and saved him from living out in restaurants and places, and he said he didn't like that; she had made a home for him."

While he did not talk to Betty about his property and money matters, he did confide in Mrs. Shute:

"Q. I would like to have you tell the court the conversations which you had with Mr. Burns in which he talked with you with reference to his children, his property, his affairs or his attitude toward his children, that sort of thing. A. Well, he told me he hadn't done much for Betty and he had done a lot for Connie; he sent Connie to be a doctor, and he wanted to do something for Betty."

■■■ We expressed the prerogative of a parent, without being charged with undue influence, in Mallow v. Walker, 115 Iowa 238, 243, 88 N.W. 452, 454, 91 Am. St. Rep. 158: "The mere fact that the distribution made by a parent of his property among his children appears unreasonable or unjust will not alone establish undue influence, and prior declarations of an intention contrary to the subsequent disposition cannot be shown to establish undue influence in respect to the disposition finally made."

V. Appellant contends the joint tenancy was only for the convenience of decedent, and not to transfer ownership to defendant upon his death. In other words, appellant contends there was no intention by decedent to create joint tenancy.

He attempts to support this contention by the testimony of

decedent's brother and sister-in-law. They testified they had arranged a joint tenancy at the banks with their son Philip, with the understanding it was for convenience only. In case of sickness he could draw on the accounts. The evidence is silent as to the procedure of accomplishing this, but that is their version. They testified Abe Burns told them he had made the same arrangement.

The difficulty with this contention is that it is an attempt to vary a written agreement by parol evidence. If the agreement is clear and unambiguous, as it is in this case, the extrinsic evidence is irrelevant and incompetent. We have considered a similar question in several recent cases, and have made a definite pronouncement that the written agreement between the joint tenants and the bank is controlling, and parol evidence is not admissible to vary the agreement. In re Estate of Winkler; In re Estate of Murdoch; McManis v. Keokuk Savings Bank & Trust Co.; Hill v. Havens; Williams v. Williams, all supra. Also see 9 C. J. S., Banks and Banking, section 286.

We have heretofore described and quoted from all these cases.

The case of McManis v. Keokuk Savings Bank & Trust Co., supra, was very similar to this case. The joint tenancy agreement was with one son. The contention by the other children was "the signature card was for convenience only and that decedent intended withdrawals during her lifetime would be used for her benefit and the balance remaining in the account at her death divided among her four children." (Page 1108 of 239 Iowa)

The court said (page 1109): "Under our rules of construction, in the absence of a plea of fraud, duress, or mistake, we are bound by the plain and expressed terms of the agreement. Extrinsic evidence tending to change this expressed intent is not competent."

The decree and judgment, as entered by the trial court, is affirmed.—Affirmed.

All JUSTICES concur except OLIVER, J., not sitting.