BETTY ANN JEAGER et al., appellees, v. GENEVA ELLIOTT et al., appellants.

No. 51674.

(Reported in 134 N.W.2d 560)

APRIL 6, 1965.

REHEARING DENIED JUNE 8, 1965.

Edward S. White, of Carroll, for appellants.

Thomas L. McCullough, of Sac City, and Bernard L. Willis, of Lake City, for appellees.

SNELL, J.—This is an action in equity by heirs and beneficiaries under decedent's will attacking transfers of property

during decedent's life. The property involved consists of real estate with mineral rights and oil and gas royalty revenues in Texas, and bonds and bank accounts in Iowa, all transferred to defendants.

Louise Emmick, a childless widow, died testate January 11, 1962, at the age of 87. She was formerly a resident of Carroll and for many years had been a client of Mr. L. E. Sweany, attorney of Carroll, who had probated her husband's estate. At the time of her death she was, and for several years last past had been, living with her brother-in-law and sister, Mr. and Mrs. Cord Best in Lake City.

Mrs. Emmick's husband died in 1948 or 1949. She lived alone for a short time and then moved into the home of her sister. They all moved to Lake City in 1950 or 1951. These exact dates do not appear and are not material.

On November 13, 1950, Mrs. Emmick, describing herself as a resident of Carroll, executed her last will and testament. The will was drawn and witnessed (as one of the witnesses) by Mr. Sweany. It provided for the payment of her debts, a bequest of $500 to Emanuel Lutheran Church, Carroll, Iowa, and the remainder of her estate was devised and bequeathed to her two brothers, John T. Albers and B. E. Albers, and her sister, Emma M. Best, share and share alike. Mrs. Best was nominated to serve as executrix without bond. Mrs. Best declined to serve and administrators c. t. a. have been appointed.

The two brothers predeceased testatrix. Mrs. Best survived testatrix but died shortly thereafter. Plaintiffs are children of the predeceased brothers. Defendants are the daughter and son-in-law of Mrs. Best.

Mrs. Emmick for a number of years had been the owner of a one-fourth interest in 325.36 acres in Archer County, Texas, a one-fourth interest in 166 acres in McMullen County, Texas, and the owner of another 166 acres in McMullen County, Texas.

On January 31, 1955, Mrs. Emmick executed and acknowledged three deeds conveying and naming as grantee of this land, Geneva Elliott. Mrs. Elliott was a niece of Mrs. Emmick and a daughter of Mrs. Best.

Although this land has since become quite valuable because

of oil and gas royalties it was not at that time productive except for grass rent. It did have a speculative value because of oil and gas leases. The only evidence as to the circumstances and conditions surrounding the execution and coincidental disposition of these deeds was by Mr. Sweany. He testified as follows:

"Mrs. Emmick discussed with me the conveyance of the interest in the properties listed in those deeds. The first communication or discussion had by her with me as to the conveyance of these properties was sometime in December 1954. She asked me to prepare deeds to these three pieces of property and convey them to Geneva Elliott. She said that they weren't worth very much and she wanted to get them off her hands. At that time I think John T. Albers was dead and *E. B.* Albers at Lidderdale was not in very good physical condition and I think in bed all the time. Mrs. Emmick had been looking after the Albers' interest for a number of years and collected the taxes from the people, paid them first of all and then collected the money back to herself and she collected the grass rent from these properties and divided it between the people. The land was already leased for oil purposes. She had nothing to do with that only pay the taxes on it. I think she had been the executrix or the administratrix of her father's estate and I think that that was how she began to take over the management of this land. After I had this direction from Mrs. Emmick to prepare these deeds, I, at her suggestion, mailed them to her at Lake City for her inspection. She was going to bring them back to the office when she felt like she wanted to and she did this on January 31, 1955. When she came to the office with the deeds, she said she wanted me to put them away in my safe with directions to deliver them on her death to Geneva Elliott or at anytime prior when she might direct me to deliver them. She then executed them in my office on that date. I acknowledged that execution and I put them in my safe or file and fastened them and marked them accordingly so we would know what they were when we found them later.

"There was a later discussion of these deeds between Mrs. Emmick and me. Sometime in 1958 at Lake City she asked me about the abstract of title, and I didn't know that I had them.

I had to go home and look in the safe to find them. I found the abstract of title and I wrote a letter back to her to that effect that I had found the abstracts and also the deeds. That letter is in the record here as an exhibit. When she was inquiring initially that time about the deeds and abstract, she said she thought she might just as well give them to Geneva because she would get them eventually and she might just as well have them and have her husband look after the details of the business * * *."

Mr. Sweany's testimony as to a subsequent delivery was as follows:

"In any event, there was a meeting in Lake City on August 13, 1959, and at which Mr. and Mrs. Best, Mrs. Emmick, Mr. and Mrs. J. D. Elliott, my wife and I and Mr. and Mrs. Elliott's daughter were present at the Best home. Mrs. Emmick and I talked privately but prior to that meeting, Mrs. Emmick wrote me another letter. * * *

"Returning now to the meeting in Lake City, Mrs. Emmick had a private discussion in the Cord Best parlor or living room and only the two of us were present. First she asked me if I had those deeds with me. I assured her that I had and she said I might just as well give it to them now—probably give it to them now because they are going to get it later and they might just as well have the experience of looking after it and the trouble. We then discussed other aspects of her business for a few moments and then we were called to the dining room to take a chair at the dining room table, and I opened up my briefcase and drew out the three deeds that are here * * * [reference to exhibits]. I showed them to Mrs. Emmick and she said I want Jack's name on those deeds too. I said well, I will have to take them back to Carroll and there was considerable discussion in the room at that time and Mrs. Best was at the table too at that time and she said as long as you are giving the children these deeds I want you to give them the deeds to our interest in this Texas property too. I said I would have to mail them tomorrow also. At that time the deeds earlier executed by Mrs. Emmick had Geneva Elliott only as the grantee. * * *

"That night I said there should be a formal delivery of the

deeds and I asked Mrs. Emmick to take the deeds and hand them to Geneva.

"She did this and Geneva handed them back to me and I was instructed by Mrs. Emmick to be sure and take them home and put J. D. Elliott's name on them also. I did this. They were put in the safe for the night and the next morning I mailed them to Mr. and Mrs. J. D. Elliott of Ames."

The deeds are dated January 31, 1955, with certificates of acknowledgment dated January 31, 1955. Attached to the deeds are additional notarial certificates of acknowledgment dated August 13, 1959.

The deed to the Archer County, Texas, land was filed for record on August 21, 1959. One of the deeds to McMullen County land was filed for record on August 24, 1959. The other deed to McMullen County land has endorsed thereon a filing date of August 14, 1959, and an actual recording date of August 26, 1959, the same as the other deed. It was recorded 50 minutes later in the same book and on the second page following. As it would have been extremely difficult to get the deed to the recording officials in Texas by August 14 there may be an error but the exact date is of no particular significance.

There is no evidence that anyone other than Mrs. Emmick and Mr. Sweany knew of the existence of these deeds prior to August 13, 1959.

In response to direct questions as to his custody of the deeds Mr. Sweany testified:

"Q. * * * Now, what did you have in your files or in your office or safe attached with the deeds with reference to your claimed instructions as to how they would be handled? A. They were in an envelope, instructions with the envelope.

"Q. Where is the envelope? A. Oh, that has been destroyed a long while ago after they were delivered.

"Q. What were the instructions on the envelope? A. Deliver to Geneva Elliott or sooner as directed.

"Q. Do you know what would have happened if Mrs. Emmick come in and said she wanted them back? Would you have given them to her? A. No,

"Q. Did you have a written authority from her that they were irrevocable delivery to you? A. Just her word is all.

"Q. Well, if she was dead, how could her word be used? A. If she was dead they were to be delivered."

Mrs. Emmick was the owner of U. S. Series E Bonds, a $2500 postal savings account in Carroll and savings and checking accounts in Lake City State Bank. The postal savings account has been cashed, the bonds have been reissued and the payees changed on the bonds and bank accounts. The dates on the bonds as they now appear vary from July 1959 to December 1961. The majority are dated January 1961 and the evidence as to the bonds and accounts is as of January 9, 1961.

Mrs. Emmick at that time was 86 years old and quite feeble. She suffered from cataracts, arteriosclerosis and high blood pressure and Parkinsonism. She had been unable to go to church for several years. She had no more than an eighth grade education. She had lived with her sister since prior to 1950. Mrs. Elliott, the sister's daughter, was attentive and helpful to her parents and to Mrs. Emmick.

Mrs. Emmick was failing mentally as well as physically. While there was evidence to the contrary there was substantial evidence that she was confused and could be easily influenced. The trial court "was impressed by the testimony of the former employee of the bank, Paul Mack, who stated that in the summer of 1959 he did not feel that Louise Emmick understood any of her business transactions; that he stated that she was definitely in the dark, didn't realize what it was all about, she was certainly very dull as to what the paper represented, and that she was not of sound mind, and that she could have been easily influenced, and that her sister, Emma Best, was the dominate personality of the two."

One of Mrs. Emmick's attending physicians testified that she was forgetful and apt to live in the very distant past. He thought she could be easily influenced and "might very well be incompetent." The other physician who had attended her said he thought she was a woman who was given to forming her own opinions. However, he also testified:

"She was a very difficult person to learn to know. In fact I

found myself wondering whether I ever did know her. She suffered from a Parkinsonism which gave her a rather far away expression that I found exceedingly difficult sometimes to penetrate. * * * I felt that she was essentially sound subject to this Parkinsonism and this seeming inability to get next to her. * * * I sometimes felt I had to reiterate and go over it with her to put a little pressure on her to get her to accept some of the things I suggested to her * * *."

From 1958 or 1959 on the Elliotts took care of Mrs. Emmick's business.

On January 9, 1961, the postal savings certificates were cashed and the bonds and bank accounts changed. Mr. Elliott testified relative thereto. During the trial various objections to testimony were made but we do not find that the competency of witnesses under the dead man statute was challenged. We quote from Mr. Elliott's testimony:

"Well, my wife and I went to Lake City and we came in the house, and Aunt Louise had her little steel box in the front room and Geneva went to the kitchen with her mother, and Aunt Louise called me in the front room and told me that she had these bonds and she wanted to have Geneva's name put on them with hers, and she says, 'I also want your name on my savings account and checking account at the bank.' So I went through the bonds, and I said, 'Well, we will have to go to the bank and cash them and have them reissued in your name and Geneva's name.' She also had some postal savings. * * *

"I said, 'Well, we will have to go to Carroll and cash your postal savings certificates and have them all reissued in bonds with Geneva's name on.' She said, 'That is what we want to do.'

"Louise and myself were present when this conversation took place and then she got ready. She got in the car and we went to Carroll. I went in with these postal certificates and I asked the man if he would have to witness her signature in the car. The car was parked in front of the post office, and he said, 'no, just have her sign them.' So we cashed those. I took the certificates out and she signed them and went back in and cashed them and took that and went back to the bank in Lake City. I don't remember whether cash or a check was received from the

post office but it was for the maximum of $2500 plus interest. We then returned to Lake City. * * *

"We parked in front of the Lake City State Bank and I went in and talked to Mr. Goodrich and Mr. Anderson about whether Aunt Louise would have to come in. I told him what she wanted done and asked if she would have to come into the bank, and he said, 'No.' He said, 'Mr. Anderson would go out to the car and witness her signature or talk to her to see that that is what she wanted done.' Then she could sign the bonds and the savings and checking account cards in the car and it was all done. The old bonds were all signed by her in the car plus the cards for the savings account and checking account, and the surplus over the bonds that were reissued was put in her checking account."

The bonds were reissued in the name of Louise M. Emmick or Geneva Elliott. The bank accounts were changed to joint accounts of Louise M. Emmick and J. D. Elliott, with right of survivorship.

It is of some significance as to Mrs. Emmick's failing mental acuity that she signed the signature cards Louisa M. Emmick rather than Louise as was her custom.

Mr. Delbert Anderson, the banker, testified that after 1959 the Elliotts did Mrs. Emmick's banking business. We quote from his testimony:

"Mr. and Mrs. Elliott came into the bank with some of Mrs. Emmick's bonds and requested that they be redeemed and the names changed. I refused at the time because Mrs. Emmick was not in the bank and Mr. and Mrs. Elliott said she was out in the car so I went out to the car to talk to her. I tried to explain what the request was and tried to get her permission to change these bonds to that effect. I did get that permission. As nearly as I could tell, she understood what she was doing. She behaved like an elderly lady and that is all I can say. She didn't say in particular what she wanted done with her bonds. I asked her if the original request was O.K. with her and she said, yes."

A secretarial employee of the bank handled the transfer of a few other bonds after contacting Mrs. Emmick at the request of Mrs. Elliott.

There was other evidence indicating Mrs. Emmick's mental and physical weakening and her increasing reliance on the Elliotts. The trial court found and we agree that from 1959 on there was a confidential relationship between Mrs. Emmick and Mr. and Mrs. Elliott.

Following the transfers of the Texas property the income therefrom increased each year. In 1961 it was $5051.20. The royalty checks were sent to and received by the Elliotts but were deposited in the joint account of Mrs. Emmick and Mr. Elliott. After Mrs. Emmick's death the income was deposited in the Elliotts' account. Prior thereto the Elliotts never used any of the money. In 1962 the Elliotts reported this income in their tax returns.

Mrs. Emmick's tax returns for the years 1958, 1960 and 1961 prepared by Mr. Sweany from figures furnished by Mr. Elliott and her return for 1959 prepared by Mr. Elliott reported the income as hers.

Asked why the money was deposited in the joint account Mr. Elliott answered, "Because we felt that was the thing to do." In regard to the tax reports he said, "I felt it was her money as well."

Mrs. Elliott when asked about the bond transactions testified:

"A. Well, she gave them to us at Lake City. * * *

"Q. With the understanding that if she wanted them back she could have them back, is that correct? A. Absolutely, yes."

Mr. Elliott filed personal property tax schedules in his own county from 1955 on but did not list any of the money in the Lake City Bank.

It is clear that all parties treated the income and the bonds and bank accounts as the property of Mrs. Emmick. The method used was treated as one of convenience and not as indicative of ownership. Any other conclusion would proceed from the premise that all the tax reports were fraudulent.

There is no evidence whatsoever that Mrs. Emmick was not in full possession of her faculties in 1955. She had independent counsel of her own attorney without the knowledge of the Elliotts. The evidence that in 1955 she executed deeds and provided

for their delivery after her death, or before if she so instructed, is uncontradicted and free from any taint or suspicion of outside influence. The execution of the deeds and delivery to Mr. Sweany clearly showed a then existing donative intent from which there was never any deviation. See Oehler v. Hoffman, 253 Iowa 631, 636, 113 N.W.2d 254. Actually the physical delivery of the deeds to the Elliotts in 1959 added nothing except to advise them of the situation and "put a little frosting on the cake." The delivery was pursuant to previous irrevocable instructions. Even assuming that a 1959 transfer if standing alone would be vulnerable to attack the most that could be said against the validity of the 1959 delivery is that it was premature in that it antedated the grantor's death. As Mrs. Emmick received the income until her death no one can complain.

We do not consider the addition of Mr. Elliott's name to the deeds and new acknowledgments by the grantor coincident therewith as destructive of the original delivery. It was supplementary but not in derogation thereof. Only the grantor and the original grantee were in any event in a position to complain. They did not complain and outsiders may not. See Division IV, infra.

As to the deeds we have the culmination of what, according to the uncontradicted testimony, was an irrevocable delivery in 1955 transferring title subject to a life estate in grantor. The life estate was terminable prior to death by the grantor. The recording of the deeds in 1959 transferred the legal title but Mrs. Emmick received the income until her death. Except that Mr. Elliott is now a joint owner with his wife, we now have exactly the same situation as would have existed if nothing had been done in 1959 and the deeds had been delivered after Mrs. Emmick's death.

We note the evidence that from 1959 Mr. Sweany was also representing the Elliotts to such an extent that he could not give Mrs. Emmick independent advice adverse to the Elliotts. The validity of the deeds, however, and the question of delivery depends on what was done in 1955 and not on what was done in 1959.

In any event the factual background dating back to 1955

and showing a donative intent from that date sufficiently overcomes the presumptions incident to Mrs. Emmick's condition and the confidential relationship existing in 1959 and later years.

The bonds and bank accounts present an entirely different factual situation. Mr. Elliott gives January 1961 as the pertinent date relative thereto. Mrs. Emmick by then was failing physically and mentally. A confidential relationship existed. She had no independent advice. No one explained to her the legal effect of what she was doing or had done. She, with the aid of the Elliotts, still reported all the income as hers. The acts and words of the Elliotts themselves refute the idea that there was a completed gift in præsenti of the bonds or bank accounts. To uphold these transfers would leave decedent's estate without funds with which to pay the specific bequest in her will and make payment of her funeral expenses dependent on others.

I. Our review is de novo. We give weight to the trial court's findings but are not bound by them. Jeppesen v. Jeppesen, 249 Iowa 702, 704, 88 N.W.2d 633, citing with approval rule 334, Rules of Civil Procedure. See also Oehler. v. Hoffman, supra, loc. cit. 635.

II. "The intent of the grantor is controlling in the matter of delivery and is to be determined by his acts or words or both." Klosterboer v. Engelkes, 255 Iowa 1076, 1080, 125 N.W.2d 115, 117.

III. We have held repeatedly that a valid delivery of a deed may be made through a third party. In Bradley v. Bradley, 185 Iowa 1272, 1282, 171 N.W. 729, 732, we said:

"That a deed made and by the grantor placed in the custody of a third person, to be delivered to the grantee only upon the death of the grantor, is valid, and, when delivered to the grantee by the depositary after the grantor's death, will take effect by relation as of the date of such deposit, is too well established to admit of discussion. [Citations] * * *. In this class of cases, title, strictly speaking, does not pass to the grantee in the lifetime of the grantor. The title remains in the grantor until his death, when, by relation, it becomes perfected in the grantee as of a prior date."

In Stewart v. Wills, 137 Iowa 16, 18, 114 N.W. 548, we said:

"If she left the deed with the notary with the intent to have it delivered after her death to the grantees named therein, it was a sufficient delivery."

Kane v. Campisano, 255 Iowa 745, 753, 124 N.W.2d 172, involved a deed executed in 1939 but not discovered for over twenty years. We quoted with approval from Brandt v. Schucha, 250 Iowa 679, 687, 96 N.W.2d 179, as follows:

" 'We have frequently held an effective delivery may be made by placing the deed with a third person, *without reserving the right to recall it,* with instructions to deliver to the grantee upon the grantor's death. The effect of thus placing the instrument with a third person is to reserve a life estate to the grantor with title immediately passing to the grantee, but the latter's right to possession is postponed until the grantor's death.' "

See also 26 C. J. S., Deeds, sections 41, 43 and 46. The rule is restated with approval in Oehler v. Hoffman, supra, loc. cit. 638 of 253 Iowa.

Our recent pronouncement in Klosterboer v. Engelkes, supra, loc. cit. 1080 of 255 Iowa is applicable and controlling as to the deeds in the case before us. We used the same words as quoted from Brandt v. Schucha, supra.

IV. The addition of the name of J. D. Elliott on the deeds, especially when done with the consent of the grantor, did not invalidate the delivery.

In Gilbert v. Plowman, 218 Iowa 1345, 1348, 256 N.W. 746, we said: "It has long been held in this state that authority to a grantee to fill a blank in a deed is implied when the grantor delivers the deed fully executed in other respects." (Citations)

In Hall v. Kary, 133 Iowa 465, 468, 110 N.W. 930, 119 Am. St. Rep. 639, we said: "That a deed thus left blank as to the grantee, being otherwise fully executed, vests title in the person whose name is subsequently inserted therein by the one to whom it is delivered as a conveyance is well settled in this State."

The distinction made in Wagle v. Iowa State Bank, 175 Iowa 92, 156 N.W. 991, is of no particular help to plaintiffs here.

The creation of an interest in the land in J. D. Elliott

neither invalidated the deeds nor created any situation about which plaintiffs may complain.

In the case at bar there was an effective delivery of the deeds to the Texas property to a third person, without reserving the right of recall and with instructions to deliver to the grantee upon grantor's death and the grantor enjoyed a life estate until her death. The deeds carried out her wishes. Oehler v. Hoffman, supra, loc. cit. 641 of 253 Iowa.

We conclude that as to the Texas property the transfers were valid and the trial court's Judgment and Decree relative thereto must be reversed.

V. A confidential relationship is defined in Burns v. Nemo, 252 Iowa 306, 311, 105 N.W.2d 217, in these words:

"A confidential relationship is present when one person has gained the complete confidence of another, purports to act with only the interest of the other party in mind, and discards any selfish advantage for himself. It is particularly present in family relationships." (Citations)

See also Oehler v. Hoffman, supra.

We have said, supra, that in the case at bar there was a confidential relationship at the time of the transfer of the bonds and bank accounts.

"Where such a confidential relationship is found to exist between a grantor and a grantee a presumption against the validity of the conveyance arises, and the burden of upholding same, as to its fairness, rests upon the grantee. Proof offered to overcome this presumption must be clear and convincing." Woolwine v. Bryant, 244 Iowa 66, 67, 54 N.W.2d 759, and cases cited therein.

This rule has been reaffirmed recently in Kunz v. Kunz, 255 Iowa 1087, 1097, 125 N.W.2d 226.

The trial court held, and correctly so, that defendants' burden of overcoming the presumption against the transfer of bonds and bank accounts had not been successfully sustained.

VI. The printed record on appeal, denominated "Abstract of Record" in two volumes is not an abstract. Unnecessary matter is included therein. It is not in compliance with rule 340, Rules of Civil Procedure. It is ordered that costs on appeal shall

be taxed three fourths to appellants and one fourth to appellees. Costs in the trial court shall be taxed one half to appellants and one half to appellees.

The case is reversed as to the Texas property and affirmed as to the Iowa property.—Affirmed in part and reversed in part.

All JUSTICES concur.