C. A. VAN EMMERIK, appellee, v. FLORENCE W. MONS et al., appellants.

Nos. 49452
49453.

(Reported in 90 N.W.2d 433)

1300

June 3, 1958.

Rehearing Denied September 19, 1958.

Herrick & Langdon, of Des Moines, for appellants.

Bray, Carson & McCoy, of Oskaloosa, for appellee.

Thompson, J.—One of the important by-products of our jury system of determination of law cases is that the courts

are thereby relieved of the necessity of finding the facts. But this refuge is not available to them in equity actions. Facts must be found; often, as in the case at bar, under the most substantial difficulties. As an appellate court we have the advantage of the rule that we give weight to the findings of the trial court on controverted matters, particularly when the credibility of the parties is concerned. Yet the matter is triable here de novo, and we must in the end make our own determination. It is a course fraught with danger. We cannot be sure, under a record such as we have here, that we are reaching the correct result. We reach the conclusion which seems most likely to be right; but with the reflection that it is possible we may be denying justice to some litigant. Struggling through a maze of pleadings and contradictory testimony consuming more than 600 pages, no human agency can be sure it has reached the truth.

Particularly is this so in the instant case. The parties contradicted each other throughout. They changed their positions from time to time, as expediency seemed to demand. On occasion, denials were made of self-evident facts. This seems especially true of the plaintiff. He admitted, then denied; often he evaded. His case would have been, if not better, at least more commendable if he had not attempted to deny his signature on important instruments. He changed his position in the middle of the trial; we may assume because it clearly appeared from the evidence then taken that he could not support his first stand. The principal defendant, Florence W. Mons, is also not free from the appearance of inconsistencies and contradictions in her case. It will be impossible in an opinion of reasonable length to comment upon all the evidence which the record shows and which able counsel have urged upon us as supporting one side or the other; nor would such an effort, if made, be of any benefit to the legal profession. We shall present a stripped-down version of the case referring only to what we deem the most important and controlling points.

The plaintiff was in 1949 the owner of two farms: one of 205 acres in Mahaska County, and one of 260 acres in Jasper County. He lived in New Sharon, in Mahaska County, and

was 62 years of age. He was a bachelor, with a limited grade school education; but he had by industry and thrift, starting as a farm laborer, accumulated the farm lands referred to. He had some substantial bank indebtedness. Florence W. Mons, who will be hereinafter referred to as the defendant unless otherwise specified, lived in New York. She is a university graduate. At all times material here she has been married but living apart and estranged from her husband. There was a distant relationship by marriage between her and the plaintiff, and they had met at times when he was visiting relatives in New York. The defendant was about 50 in 1949. She had been engaged in business, but had recently sold it. She still owned the building in which it was conducted, but soon after sold it also. From these sources, and perhaps from invested savings also, she had considerable sums available.

In 1949 an arrangement was made under which she came to Iowa to keep house for the plaintiff. Here began the tangled skein of affairs which the courts are asked to unravel. The result was this lawsuit, which started as an action by plaintiff to cancel two joint tenancy deeds, one to each of the farms, made by him to himself and the defendant Marcia Vuille-Mons, the daughter of Florence W. Mons; and likewise to cancel two mortgages, one upon each of the farms, running to Florence W. Mons and Marcia Vuille-Mons in joint tenancy. Separate actions were filed in Mahaska and Jasper Counties, the allegations of the petitions being the same except for the description of the lands involved. By stipulation the cases were consolidated for trial. The petitions averred that both the deeds and mortgages were obtained fraudulently and through the exercise of the dominant influence of the defendant in a confidential relationship, and that nothing of value was paid for them. The defendants answered, averring the validity of the mortgages and of the deeds, denying fraud and lack of consideration; and by counterclaims asking that the instruments be established as valid. The counterclaims further alleged that when the defendant came to Iowa it was orally agreed that if she would act as housekeeper and assist plaintiff in the management and operation of his properties he would furnish her a home for the remainder of her life, which agreement had been

breached to defendant's damage in the sum of $10,000; and that plaintiff further agreed, for the same consideration, to arrange his affairs so that upon his death Marcia Vuille-Mons would receive all of his property, for which purpose he made a will leaving his entire estate to her; and it was prayed that this will be declared to be irrevocable. Replies denying the material averments of the counterclaims were duly filed.

I. After the defendant came to Iowa in the year 1949 she and the plaintiff lived in a rented house in New Sharon until the following March, when they moved to plaintiff's Mahaska County farm. From that time until about the end of 1955 they continued to reside there, farming the Mahaska County land and managing the Jasper County property. Under what arrangement defendant came, what agreements were made after she came, the court can only surmise from the vast array of contradictory and confusing evidence with which the record is filled. There were no writings of consequence except for the deeds and mortgages and ten promissory notes; and under what circumstances these were made there is vast disagreement. It seems likely that for some years all went well and no one thought it worth-while to reduce whatever vague understandings existed to writing. "Writing maketh an exact man"; but there were no writings here and this lawsuit is the result.

It is fairly well established that the defendant was industrious and that the farms, which in 1949 were "run down" and showed the effects of poor husbandry, were much improved through her efforts, including a good deal of manual labor. Some of plaintiff's witnesses admitted that the land was more valuable after defendant had been there several years. But plaintiff contends that she did too much managing; in short, that by various artifices she secured his confidence and so procured the execution of the mortgages by fraud. He first made the same contention as to the joint tenancy deeds. But, the trial having commenced on January 2, 1957, on January 9 next the plaintiff amended his substituted petition and the prayer thereof by alleging that all money paid to him by the defendant and all work done by her for him was the consideration for the execution of the deeds; and the amended prayer asked only the cancellation of the mortgages. This, therefore,

and defendant's counterclaims for establishment of the will as irrevocable and for damages for failure to furnish her a home for life are the questions we must determine. The court found all issues for the plaintiff.

■ ■ II. We will take little space in discussing the question of confidential relationship of the plaintiff and defendant, or whether, if such a condition existed, the defendant was the dominating element. The parties have given much attention to it, and it apparently was given considerable weight by the trial court. We have said that the burden is upon one who relies upon such a relationship to prove it by clear evidence. Barber v. Powell, 248 Iowa 785, 792, 82 N.W.2d 665, 669; Groves v. Groves, 248 Iowa 682, 692, 82 N.W.2d 124, 130; Else v. Fremont Methodist Church, 247 Iowa 127, 139, 73 N.W.2d 50, 57. The rule should not be used merely to relieve the indiscreet man from his indiscretions, or the wastrel from his extravagances, or the fool from the consequences of his folly. In the case at bar the plaintiff was an adult, not senile, without much formal education, it is true; but he had been able enough to accumulate a considerable fortune in farm lands, in doing which he must have had considerable business experience. He had traveled somewhat; he was considered a good risk for bank loans. We are not convinced that he has made a showing sufficient to demonstrate that he was dominated by the defendant. Since the major issue here is the validity of the mortgages and we think the record shows that he got value for them, at least to the extent hereinafter set forth, the question of the burden of proof to prove fraud on the part of the defendant in procuring them is not important. We content ourselves with the statement that we do not find the evidence so clear that the rule of Curtis v. Armagast, 158 Iowa 507, 138 N.W. 873, and many other cases, applies.

III. Nor do we consider the defendant's claim that the actions to cancel the mortgages are barred by laches and the statute of limitations. As indicated in Division II, we think the mortgages are valid as security for moneys actually loaned by the defendant to the plaintiff. The question of the bar of the actions to cancel by lapse of time is therefore not material.

IV. We turn then to consideration of the facts concerning the two mortgages which the trial court held to be barred because they were obtained by fraud and without consideration. Each was dated May 9, 1950, and each was acknowledged on the same date before Cornelius Ver Ploeg, a notary public. Mr. Ver Ploeg was for many years a reputable member of the Iowa bar. The record shows that it was upon his advice that the mortgages were drawn in the respective sums of $30,000 and $45,000 upon the Mahaska County and Jasper County farms. It is not contended that all of these amounts had been advanced by the defendant at that time, or in fact that they reached those sums at any later date. Unfortunately both Cornelius Ver Ploeg and the other member of his legal firm were deceased at the time of the trial; but the defendant testified that she went with the plaintiff to the Ver Ploeg law office and advised Mr. Ver Ploeg that she expected to advance considerable sums to the plaintiff from time to time, and wished some security for the loans made and to be made. She says Mr. Ver Ploeg then advised the making of the mortgages in sufficient amounts to cover these lendings, and the mortgages were made accordingly. The plaintiff denies this, and says he did not know he was signing mortgages; but he was able to read and write, he was not a tyro in business, and the notary's certificate is that he acknowledged he signed the instruments as his voluntary act and deed. The mortgages were not recorded until March 1956 after the plaintiff had married one Mary Miller and thereby ended whatever relations, business or romantic, or both, existed between himself and the defendant. The failure to record is a circumstance in plaintiff's favor; but other matters overcome it.

We have pointed out above that plaintiff's first pleadings denied any consideration either for the joint tenancy deeds or for the mortgages. But as the trial developed, evidence which we consider quite convincing showed that the defendant had in fact advanced to him considerable sums; and his testimony to the contrary was of a character which made his entire story suspect. Thereupon he shifted his ground, abandoned his attack upon the deeds, and alleged that whatever moneys and services were advanced were in payment for the deeds, and

the execution of the deeds satisfied all claims of defendant; and his prayer was amended to ask only for cancellation of the mortgages. His first attempt to disclaim and deny the receipt of any consideration from Mrs. Mons, in the face of the record, does not appeal to a court of equity.

Evidence of payments to the plaintiff by the defendant is so persuasive it cannot be ignored. Mrs. Mons produced cancelled checks bearing the plaintiff's endorsements, as follows: September 17, 1949, $515; May 8, 1950, $5000; June 2, 1950, $1500; August 4, 1950, $8500; November 22, 1950, $2000; five other checks in the amount of $1000 each bearing dates in 1951; and a check dated August 31, 1951, in the sum of $1140.77. Deposits in the plaintiff's account at the Kellogg Savings Bank correspond with these checks. Most of the checks, both those made before and those after the dates of the mortgages and deeds, bear the notations "Loan on Note" or "Loan" in the lower left-hand corners. Loans of $3000 and $2000 · in addition to the checks are claimed by the defendant and deposits in the plaintiff's account in the bank correspond to these.

In addition, there are in the record ten promissory notes, each bearing the purported signature of the plaintiff, payable to Florence Mons and/or Marcia Vuille-Mons, the majority bearing also survivorship clauses, which integrate almost exactly with the checks and claimed loans and the deposits in the plaintiff's bank account. While plaintiff's evidence vacillated back and forth between admission of his signature on the notes and denial thereof, we are satisfied they bear his genuine writing. They integrate so closely with the Mons checks to plaintiff and the deposits in the plaintiff's account and with withdrawals from Mrs. Mons' account in the same bank, and the plaintiff's denials are so changeable, that no other conclusion is possible. No handwriting witness was called; and this, under the circumstances, militates against the plaintiff also.

Further most significant evidence appears in the testimony of Ralph Casey, who had been an auditor in the employ of the United States Internal Revenue department for several years including 1953. During that year he was called upon to audit the income tax returns of the plaintiff. The audit covered the years 1950, 1951 and 1952, and possibly some investigation of

the 1948 and 1949 returns. Mr. Casey learned that there were substantial deposits in the plaintiff's bank account which were not covered by his income tax returns, for which an explanation was requested. The plaintiff told him they represented loans "from a friend of the family." Being advised that some further proof of this was in order, the plaintiff brought to Mr. Casey's office the defendant, Florence Mons. Since the testimony is of much importance on the point at issue, we quote this excerpt:

"On the occasion when Carl Van Emmerik and Florence Mons came together to my office, they had cancelled checks and notes. They both said that those were loans from Mrs. Mons to Mr. Van Emmerik. I went through the checks and notes, confirming the checks with the notes. I have no written notes of the meeting and I do not know whether those checks have even notes, but I know there were substantial checks for every note."

Mr. Casey also went with the plaintiff and defendant to the bank at Kellogg. He says of this: "We compared deposit tickets with the bank account and traced almost all of those checks to Mr. Van Emmerik's bank account."

That Mrs. Mons loaned large sums to the plaintiff and received his notes therefor is so clearly shown that further elaboration of the evidence would be but to pile Pelion upon Ossa. The experienced and able trial court, while finding that the mortgages which it decreed to be cancelled were without consideration, seems to have placed this holding upon the theory that the money advanced was in fact payment for the joint tenancy deeds to the farms. It quoted defendant's answer to an interrogatory propounded in which she said that the consideration for the warranty deeds was the work she did upon the farms and the payment and advancement of money to plaintiff, both before and after the execution and delivery of said deeds. The trial court and plaintiff's counsel take this to be a sworn statement that *all* of the money advanced to plaintiff was in payment for the deeds to the farms. It must be conceded the answer does defendant's case no good. There are, however, other considerations. It must be remembered that at the time the interrogatory was answered the plaintiff was denying all consideration either for the deeds or the mortgages. The record also shows that defendant advanced several thousand

dollars in moneys not evidenced by the notes in question. This was largely by way of payment of farm bills and accounts as they were incurred over the years. It is reasonable to suppose, in view of the entire record here, that since she was making her home on the farm and joint tenancy deeds were made or to be made to her daughter, she paid these accounts as a contribution to the value of the land and as her share of the expense of operation. It must also be remembered, as we have said above, that the record shows her contributions in services and labor were most substantial.

A significant matter pointing to a defect in plaintiff's position at this point is that, while the deeds were made on August 29, 1950, he continued to execute notes to the defendant for moneys advanced for more than a year thereafter. Surely, if the moneys were in payment of the price of the lands deeded, he would have stopped signing notes evidencing his indebtedness thereafter; he would have said, "this is money you owe for the deeds; why should I sign notes for it?" We agree with the trial court that he knew he had executed the deeds; and we think, with his experience in acquiring and paying for farms, he knew also about mortgages. The fact that in 1953, some two years after the execution and delivery of the deeds, he contended before an investigator for the Internal Revenue Service that the advancements shown by the checks and notes were loans, and that he brought Mrs. Mons to verify his statements and made no protest when she exhibited the notes, weighs heavily against him.

The notes total $27,240.77. They are identified in the record as defendants' Exhibits Nos. 19 to 28 inclusive. Exhibit No. 24 bears interest at six per cent per annum; Exhibits Nos. 25 and 26 leave the amount of interest blank; the other seven provide for interest at seven per cent. It is our holding that these notes are each valid and are secured by the two mortgages which the plaintiff sought to cancel and which the trial court held invalid. We also hold these mortgages to be valid and enforceable but only to the extent of the amount of the notes, Exhibits Nos. 19 to 28 inclusive, with interest according to their terms.

The defendants contend that the mortgages should also be held to be security for the other moneys which Mrs. Mons advanced in payment of accounts and for the purchase of items needed on the farms. We think, however, that these were not intended as loans, but, as her answer to the interrogatory, No. 30, above referred to indicates, were a contribution on her part to the purchase price of the interest in the lands deeded to her daughter by the joint tenancy conveyances, and to the cost of operation of the farms. For these advancements she cannot recover. The parties did not see fit to make any written agreement as to what their real contract was; and we are compelled to make the best deductions possible from the uncertain and contradictory evidence in the record before us. We have indicated above what we think it fairly shows. The plaintiff having pleaded the invalidity of the mortgages, the burden was upon him to establish his contention. In re Estate of Kneebs, 246 Iowa 1053, 1057, 70 N.W.2d 539, 542; In re Estate of Ewing, 234 Iowa 950, 955, 14 N.W.2d 633, 635.

V. The defendants also predicate error upon the refusal of the trial court to hold that a will made by the plaintiff on March 5, 1949, was irrevocable. This will left a life estate in all plaintiff's property to Florence Mons, and the remainder to Marcia Mons (now Marcia Vuille-Mons). It is asserted that this will was made pursuant to an agreement that, if Florence Mons would leave her home in New York and come to Iowa to keep the plaintiff's house and help in the management and operation of his farms, he would leave his property as the will specified. It appears that this will has now been destroyed and a new one made, with plaintiff's wife, Mary Van Emmerik, the principal beneficiary. There is no doubt that a binding contract to make a will with agreed disposition of property may be made. Hatcher v. Sawyer, 243 Iowa 858, 869, 870, 52 N.W.2d 490, 493, 494; Powell v. McBlain, 222 Iowa 799, 804, 269 N.W. 883, 886. But the only evidence of the agreement here is oral; it is denied. The burden was upon the counterclaimants to establish the agreement. Without discussing the evidence in detail, we content ourselves with saying that we think the burden was not carried. We agree with the trial court at this point.

1310

■■ VI. The defendant also contends that she is entitled to damages because of the failure of the plaintiff to furnish her a home for the rest of her life. The consideration alleged is much the same as that relied upon as set out in Division V above. Again, the claimed agreement is entirely oral, and the burden of proof was of course upon the defendant. She left the home on December 1, 1955; whether with an intent to return the evidence does not make clear. A contract such as she relies upon here is valid. See Roszina v. Nemeth, 251 Wis. 62, 27 N.W.2d 886, 28 N.W.2d 885; Ottoway v. Milroy, 144 Iowa 631, 123 N.W. 467. But it must be proven. The evidence on the point is meager and we conclude fails to establish the agreement by the required preponderance.

For the reasons set out above the cause is reversed upon the trial court's holding that the notes and mortgages are invalid, and a decree will be entered establishing their validity to the extent indicated. The cause is otherwise affirmed. Costs will be taxed one half against the plaintiff and one half against the defendants, except that no costs will be taxed against the defendant Robert Vuille.—Affirmed in part, reversed in part and remanded for decree.

All JUSTICES concur except SMITH, J., not sitting.