# IN THE COURT OF APPEALS OF IOWA

————————————

No. 24-1565
Filed January 7, 2026

————————————

**Aubin Reed, Individually and as Administrator of the Estate of Marietta Muchow,**
Plaintiff–Appellant,

v.

**Lisa Muchow-King,**
Defendant–Appellee.

————————————

Appeal from the Iowa District Court for Cerro Gordo County,
The Honorable Christopher Foy, Judge.

————————————

**AFFIRMED**

————————————

Nathan J. Schroeder (argued) of JSC Legal, PLC, Cedar Falls,
attorney for appellant.

Brian W. Foddrill (argued) of Unbundled Legal Services of Iowa,
Clear Lake, attorney for appellee.

————————————

Heard at oral argument
by Chicchelly, P.J., and Buller and Langholz, JJ.
Opinion by Langholz, J.

1

**LANGHOLZ, Judge.**

Near the end of her life, 85-year-old Marietta Muchow gave her Clear Lake house to one of her four remaining children, Lisa Muchow-King. This suit—filed by Marietta's granddaughter Aubin Reed against Muchow-King—seeks to set aside that transfer based on a claim of undue influence. After a bench trial, the district court found that Reed had proved that Marietta and Muchow-King were in a confidential relationship, thus establishing a presumption of undue influence and shifting the burden to Muchow-King to rebut that presumption. But the court also found that Muchow-King met her burden to show the transaction was free from undue influence. And so, the court denied Reed's claim.

Reed appeals. And the sole question before us is whether Muchow-King rebutted the presumption of undue influence by proving with clear, satisfactory, and convincing evidence that (1) Marietta acted freely, intelligently, and voluntarily in transferring the house and (2) Muchow-King acted in good faith throughout the transaction.

On our de novo review, we agree with the district court that she did. The evidence shows that Marietta acted freely, intelligently, and voluntarily. She had the mental capacity to intelligently transfer the house, did so with the independent advice of her attorney, and acted consistent with her wish to keep the house in the family. And Muchow-King's limited involvement in the transaction—driving Marietta from Oklahoma to Clear Lake to let her meet alone with her attorney, at Marietta's insistence—was all in good faith, even if some of Muchow-King's actions with other transactions may be troubling. We thus affirm the district court's denial of Reed's undue-influence claim.

## I.

In 1994, Marietta and her husband purchased a house in Clear Lake—the subject of this dispute. When her husband died in 2008, Marietta became the sole owner of the Clear Lake house. Later that year, shortly before turning seventy-five, Marietta executed a will that left any remaining property in her estate to her five children in equal shares. Her will also provided that if any child predeceased her, that child's share would go to his or her children or, if that child had no children, would be split among the other surviving siblings of that child. And the will named Marietta's brother Ron as the executor.

Marietta lived alone in the Clear Lake house year-round for a few years after her husband's death. But that first summer of 2008, Muchow-King's daughter, who was then twelve, stayed with Marietta for June and July. And from then on, Muchow-King and Muchow-King's daughter would generally spend all summer break staying with Marietta at the house—Muchow-King worked at an Oklahoma elementary school with summers off, the same as her daughter. Muchow-King's daughter even had her own room, right next to Marietta's. Other members of Marietta's family would also visit for a few days or a week but generally stayed in a hotel rather than at the house.[1]

Then in 2010, Marietta began spending winters in Oklahoma, where two of her children—Muchow-King and her son Jim—lived. During her first winter in Oklahoma, Marietta lived in her own apartment. But after she tripped on concrete, breaking her shoulder, she started staying with Jim instead. For a few years, Marietta would live with Jim in Oklahoma for about five months and spend the rest of the year in Clear Lake.

---

[1] For example, Reed testified that she had not stayed at the house since sometime before 2008 and in total had stayed there "just a handful of times."

In September 2013, Mariette had another fall while staying alone in the Clear Lake house. When her daughter Carolyn could not reach her by phone for a couple hours, the daughter called 911, and a deputy sheriff discovered her in the basement shower bruised and without enough strength to get up. After this fall, Marietta began staying in Oklahoma for nearly ten months of the year with only a short summer stay in the Clear Lake house so that she was never away from a family member for any extended time. When school was out for the summer, Muchow-King and her daughter would drive Marietta to Clear Lake, where they all stayed until school resumed in the fall.

Over these years, Marrietta dealt with a few medical conditions, including Type 2 diabetes, high blood pressure, arthritis, and macular degeneration. When she first started coming to Oklahoma, she brought her car and would drive herself around town. But by 2015, her macular degeneration had progressed so much that she was diagnosed legally blind—although she could still see using her peripheral vision. So she stopped driving herself. And Marietta's arthritis had become so severe that writing legibly was nearly impossible. Due to these physical ailments, Marietta needed assistance with daily tasks, like driving, cooking, and writing checks. And it was primarily Muchow-King and Jim—and their respective spouses—who would help Marietta with day-to-day things because none of their other siblings lived near them.

In July 2015, Marrietta made the first codicil to her will, naming Muchow-King as the executor in place of Ron. She used the same Clear Lake law firm that prepared her will to assist her. The parties disputed the reasons for this change. Muchow-King and her daughter testified that Ron no longer wanted to serve as executor since Marietta was now living mainly in Oklahoma and he was in Wisconsin. Ron claimed Marietta told him that

Muchow-King was demanding to be added as a coexecutor before she would consider letting Marietta move into her home and that he declined to serve together with Muchow-King—so Marietta replaced him because she "really didn't have any choice."

More than a year later, in October 2016, Marietta moved to live with Muchow-King. All agree that Jim no longer wanted to care for Marietta, mainly because of her declining physical condition. And indeed, Marietta took much attention from Muchow-King. She drove Marietta everywhere she needed to go, including all her appointments and general errands. Muchow-King and her daughter cooked all of Marietta's meals except for what Marietta could cook in the microwave. And Muchow-King and her family aided Marietta with many other aspects of her daily life.

Muchow-King was also involved in Marietta's financial affairs. Muchow-King was an authorized user on Marietta's credit card and had been since 2012. She used the card to pay Marietta's expenses and sometimes for her own personal purchases. Muchow-King was also a joint account owner on two of Marietta's bank accounts, she aided Marietta in "doing her bills," and she would help Marietta write checks. And for all this care, Marietta insisted on paying Muchow-King $1,000 per month to live with her—as she had when living with Jim.

Marietta continued to keep in touch with her family—at least for a while. Her brother Ron would call every week or two and "constantly asked her to sell" the Clear Lake house. Ron believed selling the house was in Marietta's best financial interest since she bore the full cost of its upkeep despite spending only a short period of each year there. But Marietta grew tired of being "harped at" by Ron on the subject—sometimes declining to answer his calls—and repeatedly told him that she did not want to sell.

In September 2017, Marietta's oldest daughter Connie—also Reed's mother—died. The family held a memorial in Clear Lake about a year later—over the Fourth of July 2018—which the whole family attended. This was the last time Reed, Ron, or Carolyn, would see Marietta in person. Both Carolyn and Ron testified that despite the decline in her physical health, her mental capacity was good and that they did not notice any cognitive decline. Reed also mentioned no mental decline, though she described Marietta as "a lot more despondent than she previously had and just a lot quieter and not as talkative." The family members also testified that during the visit, they saw Lisa "berate" or "yell" at Marietta about various things.

Later that year, Marietta suffered a seizure initially believed to have resulted from a stroke. Muchow-King drove her to the emergency room and it was later determined the seizure was caused by a lack of sodium—not a stroke. Marietta soon recovered. But because of the incident, her legs were weak so her doctor suggested she attend rehab. Marietta did so at a rehab facility that doubles as a long-term care facility. She stayed there for about three months before moving back in with Muchow-King in late January 2019.

There is more conflicting testimony about whether Marietta wanted to stay in the long-term care facility or move back in with Muchow-King. A report from the hospital noted that Marietta "talked about . . . wanting to go to an [assisted living facility] or [long-term care] because she doesn't want to live with her daughter anymore." Ron also testified that Marietta "said she'd rather be in a nursing home than going back to live at Lisa's." And Carolyn too testified that Marietta wanted to stay at an assisted living facility but Muchow-King told her she "didn't have the money." But Muchow-King maintained that Marietta did not want to stay in a long-term care facility. She said Marietta "didn't want to pay. She didn't want to spend $6,000 a month."

Shortly after returning to Muchow-King's home, Marietta told Muchow-King that she "wanted to go see her lawyer." Marietta did not explain why beyond saying that she had "loose ends to tie up." Muchow-King responded that she would get recommendations for a lawyer in the area. But Marietta insisted that she "go to her lawyer in Clear Lake." Marietta also rejected Muchow-King's suggestion that they wait until spring. So with Marietta sitting beside her, Muchow-King phoned the Clear Lake law firm that Marietta had previously used for her will, codicil, and other legal work. Muchow-King told the legal assistant who answered that Marietta "wanted to talk to the lawyer, that she had some things she needed to discuss, and I did not know what that was." And then in early February—twelve days after Marietta left the rehab facility—Muchow-King drove her roughly eight hours from Oklahoma to Clear Lake for the meeting.

Muchow-King waited in the law firm's lobby while Marietta met with the attorney alone. Although he had practiced at the firm for more than forty years, the attorney did not recall previously doing work for Marietta; the attorney who had prepared her will and codicil was no longer with the firm. They talked about Marietta's needs for about thirty minutes. The attorney agreed that he did not know in advance what Marietta wanted, that nothing about the meeting made him "feel uneasy" or like "there was something going on that shouldn't be," and that "nothing unusual stood out." He said that Marietta "knew what she wanted, and she told me what she wanted very clearly," so he had no reservations assisting her with her requests. And during cross-examination, he rejected the idea that he was merely a "scrivener, more or less," explaining his view that "I think it's more than that," and emphasizing, "If I see any alarms go off, I think I have a duty to further investigate that."

7

The attorney then prepared a deed transferring the Clear Lake house to Muchow-King. He also prepared healthcare and general powers of attorney naming Muchow-King as Marietta's attorney-in-fact on both. Marietta signed the deed and powers of attorney in the attorney's presence. The attorney recalls that Marietta "was really slow at signing." But he reiterated at trial that "she appeared to be alert and understand exactly what she was doing, and she seemed to understand who she was doing it for." Throughout the meeting and the execution of the deed, the attorney "never visited at all" with Muchow-King.

It was not until they were back in the car that Marietta told Muchow-King, "I gave you the house." When Muchow-King tried to clarify whether Marietta meant that she "put all of the kids' name on it or . . . put it in a trust," Marietta explained to her—according to Muchow-King's testimony—"No, I gave it to you and the kids because I want you to enjoy it since your kids spent their whole entire life up here, and you guys are the only ones who ever came here and spent time, and I know that you care for that house as much as I do."

Back in Oklahoma, Marietta and Muchow-King would still occasionally talk about the Clear Lake house. For example, Marietta asked whether she should "move out of her room"—"Absolutely not. It's your room" was the response. And despite the transfer of ownership, property taxes and other expenses related to the house continued to be paid from Marietta's joint checking account with Muchow-King. According to Muchow-King, Marietta requested that the expenses be paid in this way.

Marietta continued living with Muchow-King except for stays in the hospital and rehabilitation facility again in the summer and fall of 2019. And again, there is some conflicting evidence about whether Marietta wanted to

return to live with Muchow-King or to stay in a healthcare facility. For example, one hospital report noted that Marietta "wants to go to [assisted living] a place of her own since her [daughter's] home is too busy for her." But Muchow-King testified that Marietta just "did not want to be a burden" and never told her that she did not want to live with her anymore. And in any event, Marietta did move back in with Muchow-King for another year or so.

Marietta contracted COVID-19 and passed away in October 2020—twenty months after she transferred the Clear Lake house to Muchow-King. Up to this point, Muchow-King had not told any of Marietta's other children about the transfer.[2] She testified at trial that she "didn't want to rub it into anybody's face or say anything that sounded like I was rubbing it into anybody's face. I'm not that way." But there was no evidence that any of the family members had asked her about the house or that Muchow-King ever lied about—or otherwise affirmatively concealed—the transfer. And the next month at Thanksgiving, Marietta's son Jim asked about what would happen to the Clear Lake house for the first time. Muchow-King told him that Marietta gave it to her, explaining that Marietta "said that she wanted me to have it for the kids because they spent their whole life there." Marietta's daughter Carolyn learned of the transfer from Jim in June 2021, and the news eventually spread to the rest of the family.

In September 2022, Reed sued Muchow-King to set aside the deed transferring the Clear Lake house. Acting in her individual capacity and as the administrator of Marietta's estate, Reed claimed that the transfer was a result of undue influence.

---

[2] Only three of Marietta's five children survived her: Muchow-King, Carolyn, and Jim. Marietta's other son Scott had passed away earlier in 2020.

The district court held a three-day bench trial in October 2023. Reed testified and called Marietta's brother Ron, daughter Carolyn, and Muchow-King as witnesses. In addition to her own testimony, Muchow-King called her daughter, the Clear Lake lawyer who met with Marietta and prepared the deed, and one of Marietta's neighbors. Marietta's son Jim did not testify.

In its detailed and thoughtful written ruling, the district court agreed with Reed that Marietta and Muchow-King were in a confidential relationship at the time Marietta transferred the Clear Lake house—thus shifting the burden to Muchow-King to prove "by clear, convincing, and satisfactory evidence that the transfer was not the result of undue influence." But the court found that Muchow-King met her burden to rebut that presumption of undue influence.

The court reasoned that this finding was supported by much evidence in the record. Focusing first on whether Marietta acted freely, intelligently, and voluntarily, the court found that "Marietta was still mentally capable of handling her own affairs" on the day she executed the deed even though "she suffered from a variety of physical ailments." The court also relied on the involvement of the Clear Lake attorney in assisting Marietta with the transfer, emphasizing that "[e]ven with the benefit of his decades of experience as a lawyer, [he] did not observe or sense that anything improper was afoot" and that the attorney "was clear that [Muchow-King] did not participate in his meeting with Marietta and played no part in the legal work he performed for Marietta that day." And the court found that Marietta "had legitimate, rational reasons for" leaving the Clear Lake house to Muchow-King—finding that "Marietta wanted to keep the Clear Lake Home in the family" and that "[b]ased on what Marietta saw and observed of her children, leaving the Clear Lake Home to [Muchow-King] was the best way to make

sure that the property remained in the family and was not sold in the course of probating her estate."

As for Muchow-King's good faith, the court found that Muchow-King's choice to "honor[] the wishes of her mother" by taking her to meet with the Clear Lake attorney "undercuts any claim she was acting with an improper purpose or intended to unduly influence her mother." The court reasoned that if Muchow-King were "the true instigator of the transfer and Marietta was simply bending to her will, there would be no reason for [Muchow-King] to use an attorney who was eight hours away to accomplish her purpose"—"it would have been much simpler and much less physically demanding on both her and her mother for Lisa to locate an attorney in [Oklahoma] who was licensed to practice Iowa law and have that attorney prepare the necessary papers." And the court pointed to Muchow-King's "care of Marietta for nearly four years after her brother Jim gave up his role as her caregiver because it was too burdensome," finding that "[t]he time and energy devoted by [Muchow-King] to caring for her mother belie an intention to wrongfully procure an improper favor."

The court also noted that Marietta's son Jim "was listed as a potential witness by both parties" but "was never called to testify" or "deposed," despite being "in the best position to observe and have personal knowledge" to support Reed's theory that Muchow-King "isolated, mistreated, and manipulated Marietta to get the Clear Lake Home" and having "a personal interest in helping to set aside the transfer." So the court reasoned that this "suggests to the Court that his personal observations would not have supported the claim of undue influence . . . or that he saw no reason to challenge" the transfer, and "[e]ither way, the absence of any testimony from Jim at the trial does not reflect favorably on the" undue-influence claim.

The court thus denied Reed's petition. And Reed now appeals.

## II.

The parties agree that this case was tried in equity, so our review is de novo. *See Geerdes by Jenkins v. Cruz*, 7 N.W.3d 22, 28 (Iowa 2024). While we are not bound by the district court's factual findings, we give them weight— especially when based on witness-credibility determinations. *See id.*; Iowa R. App. P. 6.904(3)(g). We do so because "the district court has a front-row seat to the live testimony, viewing the demeanor of both the witness as she testifies and the parties while they listen, whereas our review is limited to reading black words on a white page of a sterile transcript." *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024).

To set aside a property transfer made during the life of the grantor (an "inter vivos transfer" in property speak) based on a claim of undue influence, a plaintiff must ordinarily prove four elements by clear, satisfactory, and convincing, evidence:

> (1) The grantor must be susceptible to undue influence, (2) opportunity on the part of the grantee to exercise such influence and effect the wrongful purpose must exist, (3) a disposition on the part of the grantee to influence unduly for the purpose of procuring an improper favor must be present, and (4) the result must clearly appear to be the effect of undue influence.

*Geerdes*, 7 N.W.3d at 28 (cleaned up). But if a confidential relationship exists between the grantee and grantor, then undue influence is presumed.[3] *See id.* And the burden of proof instead shifts to the grantee to prove that the

---

[3] "A confidential relationship embraces those multiform positions in life wherein one comes to rely on and trust another in [her] important affairs. It arises whenever a continuous trust is reposed by one person in the skill and integrity of another." *Geerdes*, 7 N.W.3d at 28–29 (cleaned up).

transaction was free from undue influence. *See id.*; *see also Jackson v. Schrader*, 676 N.W.2d 599, 604 (Iowa 2003). To meet that burden and "rebut[] the presumption of undue influence arising from a confidential relationship only requires the grantee of a transaction to prove by clear, satisfactory, and convincing evidence that the grantee acted in good faith throughout the transaction and the grantor acted freely, intelligently, and voluntarily." *Jackson*, 676 N.W.2d at 605.

Here, the district court found that a confidential relationship existed between Marietta and Muchow-King at the time Marietta transferred the Clear Lake house. Neither party challenges that finding on appeal. Rather, they dispute whether Muchow-King met her burden to rebut the presumption of undue influence that arises from that confidential relationship. *See id.* Muchow-King defends the district court's finding that she met her burden to prove that the transfer of the Clear Lake house was not the product of undue influence. Reed argues that Muchow-King failed to meet that burden. On our de novo review, we agree with the district court that Muchow-King met her burden to prove by clear, satisfactory, and convincing evidence that Marietta "acted freely, intelligently, and voluntarily" in transferring the Clear Lake house and Muchow-King "acted in good faith throughout the transaction." *Id.*

*Marietta's Free, Intelligent, and Voluntary Action.* Like the district court, we find that three main pillars support our finding that Marietta freely, intelligently, and voluntarily transferred the Clear Lake house to Muchow-King: Marietta's mental capacity, the independent advice she received from

13

her attorney, and her desire to keep the house in the family. We will address each in turn.[4]

First, the evidence shows that Marietta had no diminished mental capacity when she executed the deed transferring the Clear Lake house to Muchow-King. The last time that Reed, Ron, or Carolyn saw Marietta was at Connie's memorial in 2018. None reported any indication of cognitive impairment that day. Ron even testified that Marietta's "mental capacity was pretty good" the day of the memorial. And Ron spoke with Marietta by phone once a week—until 2018 when it became less regular—and at no point did he testify that he noticed any signs of cognitive decline from his frequent conversations with her. Carolyn too called Marietta often and similarly offered no testimony that she noticed any such decline. What's more, the attorney who was present when Marietta executed the deed testified that Marietta "knew what she wanted, and she told me what she wanted very clearly," and that "she appeared to be alert and understand exactly what she was doing, and she seemed to understand who she was doing it for."

While Reed is correct that "Mentally Capable is not the same as Freely, Intelligently, and Voluntarily," one's mental capacity and mental strength is a consideration in undue-influence cases. *See In re Est. of Herm,* 284 N.W.2d 191, 200 (Iowa 1979) ("Mental strength of the person dominated has a direct bearing on the issue of undue influence."). To be sure, the absence of cognitive decline does not in itself foreclose the possibility of undue influence. Nor does it establish that the transfer of the Clear Lake

---

[4] The district court also found that "the absence of any testimony from Jim at the trial does not reflect favorably on the" undue-influence claim. Reed argues that this was error when Muchow-King had the burden to rebut the presumption of undue influence. We conduct our de novo review without giving any consideration to absence of this testimony and thus need not decide that issue.

house was executed freely, intelligently, and voluntarily. But "Iowa courts have viewed the circumstance of the mental strength of the person dominated as having a direct bearing on the issue of undue influence in a confidential relationship." *Peoples Bank & Tr. Co. of Cedar Rapids v. Lala*, 392 N.W.2d 179, 185 (Iowa Ct. App. 1986) (collecting cases). And our court has repeatedly considered the mental capacity of the grantor in rebutting the presumption of undue influence. *See Cich v. McLeish*, No. 18-0069, 2019 WL 1056804, at *2 (Iowa Ct. App. Mar. 6, 2019) (noting the grantee "lacked the mental capacity to manage her own affairs" as evidence that the transfer was not made freely, intelligently, and voluntarily); *In re Guardianship of Chott*, No. 18-1499, 2019 WL 4297854, at *4 (Iowa Ct. App. Sept. 11, 2019) (finding the grantor's dementia and Alzheimer's showed that the transfer was not made freely, intelligently, and voluntarily). We find that the evidence of Marietta's mental capacity provides strong support to rebut the presumption of undue influence.

Turning to the second—and perhaps most important—pillar, the evidence shows too that Marietta had the chance to get independent advice from her attorney who then prepared the deed transferring the house. While independent advice is "not essential to uphold a transfer," it remains "an important consideration" in undue-influence cases. *First Nat'l Bank in Sioux City v. Curran*, 206 N.W.2d 317, 323 (Iowa 1973); *see also Luse v. Grenko*, 100 N.W.2d 170, 174 (Iowa 1959) (finding that "independent advice to the transferor is an important consideration where there is a confidential relation[ship]" and the transferee is in a position of dominance). In considering whether a donor had independent advice, we look at whether

> the donor had the benefit of conferring fully and privately upon the subject of [her] intended gift with a person who was not only competent to inform [her] correctly as to its legal effect, but who was furthermore so

15

> disassociated from the interests of the donee as to be in a position to advise the donor impartially and confidentially as to the consequences to [herself] and of [her] proposed benefaction.

*Curran*, 206 N.W.2d at 323.

It is undisputed that Marietta conferred privately with the attorney concerning the transfer and the power of attorney documents. And as an experienced attorney, he was competent to inform Marietta of the deed's legal effect. He was also disassociated from the interests of Muchow-King, whom he had never spoken to. So the attorney was in a position to advise Marietta "impartially and confidently" as to the consequences of the transfer of the Clear Lake house. *Id.*

Still, Reed argues Marietta did not receive independent advice because she went to the meeting intending to execute a deed. *See Herm*, 284 N.W.2d at 200 (finding no independent advice when the transferor "went to the attorney for the express purpose of having the deed prepared" and there was "no evidence [the transferor] either sought or received independent advice" from the attorney). But unlike *In re Estate of Herm*, on which Reed relies, the evidence here is that the attorney did give Marietta advice—they met for nearly thirty minutes before he prepared the deed. And when pressed during cross-examination by Reed, the attorney rejected the idea that he was merely a "scrivener, more or less," explaining that he did "more than that." So the facts here fit comfortably with previous cases where our court has found meetings with an attorney to initiate a transfer amounted to independent advice. *See Natvig v. Natvig*, No. 23-1992, 2024 WL 4611522, at *6–7 (Iowa Ct. App. Oct. 30, 2024); *Lawrence v. Struve*, No. 24-0526, 2025 WL 2058232, at *2–3, 7 (Iowa Ct. App. July 23, 2025).

Third, the evidence shows that Marietta intended for the Clear Lake home to remain in the family. Both Ron and Carolyn testified that they urged Marietta to sell the house many times. Ron said that he called Marietta every week or so and that he would raise the topic of selling the house—a practice that got on Marietta's nerves. Carolyn likewise suggested Marietta sell the house and use the money to pay the cost of moving into a nursing home. And some of these conversations occurred prior to Marietta moving in with Muchow-King. This pattern of Marietta's refusal to sell is particularly telling in light of her rare use of the house, especially towards the end of her life.

The evidence also shows that Muchow-King assumed the responsibility of caring for the house and out of all Marietta's children she spent the most time there. The persistent pressure to sell the house combined with the lack of use by other family members could reasonably have led Marietta to fear that, upon her passing, the home would no longer remain in the family. Marietta's decision to transfer the house to Muchow-King thus aligns with her intent to keep the house in the family, further supporting that the transfer was made freely, intelligently, and voluntarily.

At bottom, Marietta was mentally capable, she had independent legal advice, and the transfer was consistent with her desire to keep the Clear Lake house in the family. Thus, we find Muchow-King has proven by clear, convincing, and satisfactory evidence that Marietta acted freely, intelligently, and voluntarily in transferring the Clear Lake house to her.

*Muchow-King's Good Faith*. Turning to the other party to the transaction, we also find that Muchow-King "acted in good faith throughout the transaction." *Jackson*, 676 N.W.2d at 605. In many respects, this is just a flip side of the same question—focused instead on the grantee's conduct to see whether she was acting in good faith or unduly influencing the grantor.

So it is perhaps no surprise that Reed has pointed us to no case—and we have found none—where a court has found that the grantor made the transfer freely, intelligently, and voluntarily but still found the grantee failed to act in good faith throughout the transaction.

Here, the evidence shows that Muchow-King had very little to do with the transaction. She did not execute the transaction herself through a power of attorney or ownership of a joint account. She did not prepare a deed and present it to Marietta to sign. She did not pressure Marietta to transfer the Clear Lake house to her.

Rather, she agreed to Marietta's request to drive her to meet with her attorney in Clear Lake without any knowledge as to what Marietta intended to discuss with the attorney. Muchow-King did not instigate the trip—to the contrary, she suggested Marietta should see an Oklahoma attorney instead. But Marietta insisted, and Muchow-King respected that wish. So Muchow-King took time off work to drive Marietta over sixteen hours round trip so Marietta could meet with the law firm Marietta desired. She then waited in the lobby while Marietta met with the attorney privately. Only after the meeting did Marietta tell Muchow-King about the transfer.

In arguing that the evidence shows a lack of good faith, Reed mainly points to evidence suggesting that Muchow-King may have acted in bad faith with respect *other* financial transactions. And if this case were seeking to recover funds spent on Marietta's credit card for Muchow-King′s personal expenses or for those paid from Marietta's assets on expenses for the Clear Lake house even after Marietta no longer owned the house, our finding might be different. But the issue here is whether Muchow-King "acted in good faith throughout *the transaction*" being challenged, not in all other transactions. *Jackson*, 676 N.W.2d at 605 (considering transactions one-by-one, finding the

presumption rebutted for some and not others). As we have discussed, Muchow-King has presented evidence that with respect to the transaction challenged here—the transfer of the Clear Lake house—she has acted in good faith throughout.

We are mindful too that our supreme court set this current standard for rebutting the presumption of undue influence arising from confidential relationships to ensure that it is not "unreasonably demanding" and thus improperly causing "the invalidation of bona fide transfers to a dominant party in a confidential relationship." *Id.* at 600. As the court emphasized then, "notwithstanding the susceptibility of a grantor to undue influence and the opportunity of a grantee to exercise such influence, it is possible to have an inter vivos transfer between such parties that is not the product of undue influence." *Id.* at 604; *cf. Geerdes*, 7 N.W.3d 24 (reiterating that "individuals are generally allowed to dispose of their property as they see fit" and cautioning against giving "too much weight to the perceived improvidence of the transaction"). Such is the case here.

Muchow-King has met her burden to rebut the presumption of undue influence arising from her confidential relationship with Marietta for Marietta's transfer of the Clear Lake house. We thus affirm the district court's judgment in her favor.

**AFFIRMED.**